## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOHIMER WEALTH MANAGEMENT LLC, Individually and on Behalf of Other Credit Suisse Group AG AT1 Bondholders,<br><br>                    Plaintiff,<br><br>          vs.<br><br>BRADY W. DOUGAN, ERIC VARVEL, JAMES L. AMINE, TIMOTHY P. O'HARA, DAVID MILLER, BRIAN CHIN, CHRISTIAN MEISSNER, GAËL DE BOISSARD, URS ROHNER, TIDJANE THIAM, THOMAS GOTTSTEIN, SIR ANTÓNIO HORTA-OSÓRIO, ROBERT S. SHAFIR, LARA J. WARNER, RICHARD E. THORNBURGH, ANDREAS GOTTSCHLING, MICHAEL KLEIN, and NOREEN DOYLE,<br><br>                    Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE.......................................................................11

III.    PARTIES ...........................................................................................................12

IV.     STATEMENT OF FACTS................................................................................19

        A.      Background Facts                                                          19

        B.      The Brady Dougan Era—The New York Investment Bankers Take Control      30

        C.      Tidjane Thiam Fails to Right the Ship — "Cultural Issues Can't Be Resolved
                Overnight"                                                                37

        D.      Thomas Gottstein Promised a "New Credit Suisse" But Was "Jettisoned After
                a String of Seismic Scandals."                                            42

        E.      António Horta-Osório's Failed Cultural Shift                              49

        F.      Axel Lehmann and Ulrich Körner Were Unable to "'Stem the Loss of Trust
                That Had Accumulated Over the Years.'"                                    51

V.      RELEVANT SWISS STATUTES AND DEFENDANTS' BREACHES THEREOF.......58

        A.      Relevant Swiss Code of Obligations                                        58

        B.      Defendants Violated Their Duties to the AT1 Bondholders.                  60

VI.     CLASS ACTION ALLEGATIONS....................................................................63

VII.    CLAIM ALLEGED .............................................................................................68

VIII.   REQUEST FOR RELIEF....................................................................................69

IX.     JURY DEMAND .................................................................................................70

## I.    INTRODUCTION

> "***The bank could not be saved****. **I apologize that we were no longer able to stem the loss of trust that had accumulated over the years***…"
>
> Credit Suisse Group AG Chairman Axel Lehmann, April 4, 2023

1.    Credit Suisse Group AG, a 167-year-old international banking and financial services giant, collapsed in mid-March 2023. Over $17 billion of "Additional Tier One" (or "AT1") bonds issued by Credit Suisse were wiped out in the collapse. This case is brought by Plaintiff Hohimer Wealth Management LLC, Seattle, Washington-based investment adviser firm which was a holder of AT1 bonds during the Class Period specified below, on behalf of himself and a class of AT1 bondholders to recover these losses.[1]

2.    The collapse, as Chairman Lehmann admitted, was the result of the ***"loss of trust … accumulated over the years."*** The Expert Group on Banking Stability, established by the Swiss Federal Department of Finance in the aftermath of the takeover of Credit Suisse by UBS, reached the same conclusion in its September 1, 2023 Report:[2]

> On 19 March 2023, Credit Suisse became the first global systemically important bank (G-SIB) to face imminent resolution. This had been ***preceded by years of scandals, flawed strategies, poor profitability, and many changes of management at the bank. … Its demise was caused by customers losing confidence in its management and in the bank's business conduct***. … Credit Suisse ultimately suffered a bank run and was no longer able to recover without support.
>
> \*                    \*                    \*
>
> ***Ultimately, Credit Suisse failed due to a crisis of confidence.*** Banking requires trust as its customers are unable to see what the bank is doing with their money.

---

[1]    Allegations pertaining to each plaintiff are made on the personal knowledge of that plaintiff; other allegations are made upon information and belief and a good faith belief that substantial evidentiary support will be available after a reasonable opportunity for discovery.

[2]    Report of the Expert Group on Banking Stability 2023: *The Need for Reform After the Demise of Credit Suisse*, pp. 10, 15. (Emphasis added.)

Markets, investors and customers lost confidence in the bank, and withdrew their assets, resulting in a run on the bank.

The Swiss Financial Market Supervisory Authority (FINMA) also reached this conclusion in an 83-page Report released on December 19, 2023:

> Recurrent scandals undermined the bank's reputation, weighed on its results, and resulted in customers, investors, and the market losing faith in the bank. … [T]he loss of confidence in the bank led to very rapid and widespread liquidity outflows, which were exacerbated by digital means of communication (digital bank run) and ultimately brought the bank to the brink of insolvency.[3]

3.      Loss of trust is often, and foreseeably, fatal for a bank. Here, the "loss of trust" didn't "just happen." It wasn't inevitable or unstoppable. It wasn't an "Act of God."

4.      The former Credit Suisse directors and senior executives sued herein are responsible for the loss of trust, the resulting failure of the Bank and the losses incurred by the AT1 holders.

5.      A remarkable consensus supports the view that Credit Suisse's senior leadership caused its demise. President of FINMA, Marlene Amstad, stated that Credit Suisse failed because of "many scandals and bad decisions by management."[4] Swiss Finance Minister Karin Keller-Sutter referred to Credit Suisse's board of directors and executive board as "arsonists."[5] Well-known economist Thierry Philipponnat observed that "[w]hat we've seen over the past weeks has been years in the making. We have seen scandal after scandal at Credit Suisse. Banking is all about

---

[3] *"Lessons Learned from the CS Crisis"* (the "FINMA Report"), December 19, 2023, at 7: https://www.finma.ch/en/~/media/finma/dokumente/dokumentencenter/myfinma/finma-publikationen/cs-bericht/20231219-finma-bericht-cs.pdf?sc_lang=en&hash=3F13A6D9398F2F55B90347A64E269F44

[4]      *"Finma Chair Accuses Credit Suisse of Lack of Cooperation,"* Finews, March 27, 2023: https://www.finews.com/news/english-news/56475-finma-chair-accuses-credit-suisse-of-lack-of-cooperation-marlene-amstad.

[5]      https://www.swissinfo.ch/eng/bloomberg/swiss-minister-calls-credit-suisse-managers--arsonists-/48543518.

trust, and trust in Credit Suisse has been broken."[6] The financial press published numerous articles with titles such as "*Scandal and Mistrust Ended Credit Suisse's 166-Year Run*."[7]

6.      The loss of trust began in the wake of unending, headline-grabbing scandals that began during and after the Global Financial Crisis and continued unabated to the end. The frequency and severity of the scandals, blow-ups, fines, and even criminal convictions led progressively and inexorably to the widely accepted view that Credit Suisse's culture, particularly its "risk culture," was rotten and was not getting better.

7.      As these "culture risk failures" piled up, it became apparent that more failures— more scandals, blow-ups, fines and material losses—were increasingly likely. While the scandals garnered headlines, it was the fear of what lurked beneath that ultimately led to the fatal loss of trust. As noted in an October 27, 2022, *New York Times* article: "[f]ears about undiscovered financial land mines in the bank's books have weighed heavily."[8] The market, in other words, rightly assumed that it was only seeing the tip of the iceberg.

8.      Trust, in this context, rests largely on the perceived ability of a financial institution to manage risk appropriately. Risk culture is foundational to a bank's risk management. Risk culture is especially important where, as here, the financial institution's risk management systems and controls are inadequate. Risk culture is supposed to close the gap between approved risk exposure and the capabilities of the existing risk management system—and to head off risk exposure beyond that approved by the Board and senior management.

---

[6]    Thierry Philipponnat, Chief Economist at Finance Watch: https://www.finance-watch.org/press-release/credit-suisse-when-trust-disappears/.

[7]    https://www.bloomberg.com/news/articles/2023-03-19/how-scandal-and-mistrust-ended-credit-suisse-s-166-year-history#xj4y7vzkg.

[8]    Michael J. de la Merced, *Credit Suisse Unveils Sweeping Revamp to Revive Its Fortunes*, *NewYork Times* (Oct. 27, 2022).

9.      Risk management in general, and risk culture in particular, were even more critical for Credit Suisse because of its highly unusual positioning in the banking universe. Credit Suisse sought to serve the wealthiest and most sophisticated banking clients in the world. A significant percentage of the Credit Suisse's asset base was tied to these extremely wealthy and sophisticated clients, who were able to assess risk and act on their assessments, including by withdrawing or moving assets, in near real-time. As the Expert Group Report noted: "The bank run occurred in the private banking arm and mainly involved the unsecured deposits and managed assets of very high net worth customers."

10.      "Loss of trust" is what happens when clients, customers and counterparties conclude that a bank's risk culture is broken—and that their own interests are being placed at risk as a result.

11.      Loss of trust is a phenomenon that often, as here, happens (as Hemingway put it) "gradually, then suddenly." UBS Chief Executive Sergio Ermotti recently said, to the same effect, that Credit Suisse endured a "slow, painful decline—and dramatic finish," brought about by "people who demonstrated great negligence in their duties," resulting in "repeated risk management and operational failures which undermined the credibility of its leadership and the board."[9] The FINMA Report observed that "the situation of CS deteriorated massively within an extremely short time."[10]

12.      Just a month before the collapse, an article entitled "*Credit Suisse Needs a Cockroach Exterminator*" encapsulated the growing sentiment:

> When you see one cockroach, you can be pretty sure there are more under the floor or in the walls. It's often like that with companies and bad news, too: That's the cockroach theory in markets. A minor scandal, a surprise loss, a litigation charge:

---

[9]    https://www.ft.com/content/7caceb97-c7cf-40be-93ea-4b8ac9919bf7

[10]    FINMA Report at 7.

Any one of these can leave a seasoned investor nervous that more trouble will scuttle out. Credit Suisse Group AG has had a deep infestation for years and the critters just keep coming.[11]

13.     Credit Suisse clients, customers, and counterparties finally concluded they had seen enough; during the weeks preceding the collapse, they reached a tipping point in terms of trust and perceived risk arising from the bank's broken risk culture, and they reacted by pulling billions of dollars of assets out of Credit Suisse, precipitating its collapse.

14.     As former New York Fed President William Dudley has observed, "[e]thical problems in organizations originate not with 'a few bad apples' but with the 'barrel-makers.' That is, the problems originate from the culture of the firms, and this culture is largely shaped by the firms' leadership."[12] The Bank's directors and senior executives were responsible for the bank's extraordinarily weak risk culture and for the resulting risk culture failures.

15.     Wherever located, Credit Suisse's directors and executive board members were bound by duties set out in the Swiss Code of Obligations ("CO"). Those duties were owed not only to Credit Suisse but also, by statute, directly to its shareholders and creditors. *"The members of the board of directors and all persons engaged in the business management or liquidation of the company are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties."* Art. 754, para. 1 CO. Defendants' failure to instill and enforce a strong risk culture, particularly in view of the inadequacy of Credit Suisse's risk management tools and controls, was in breach of their statutory duties.

---

[11]    https://www.moneycontrol.com/news/opinion/credit-suisse-needs-a-cockroach-exterminator-10109841.html.

[12]    https://www.bis.org/review/r141021c.htm.

16.    While Credit Suisse's historical roots were in Zurich, Switzerland, most of the people who were most responsible for its demise were not staid Swiss bankers, but rather, sharp-elbowed New York investment bankers. The rotten culture that, in the words of the 2021 Paul Weiss Report,[13] "encouraged aggressive risk-taking and injudicious cost-cutting," originated in the New York-based investment bank ("IB") and then metastasized. As a result, "there were *significant deficiencies in Credit Suisse's overall risk culture* and the failure to prioritize risk management."[14]  (Emphasis added).

17.    A persistent reason for these "significant deficiencies," particularly in the New York-based IB operation, was that the business leaders themselves (including the successive heads of the IB, sued herein) had little, if any, interest in changing the compensation practices that produced, for themselves as well as a large cadre of IB managing directors, massive, in many ways unhealthy, bonus and deferred compensation payouts. FINMA observed that Credit Suisse "paid out very high variable compensation, even in years when it made huge losses. It generated a cumulative net loss of CHF 2.1 billion over the last ten financial years, while the total variable remuneration came to over CHF 33 billion in the same period according to the Compensation Reports."[15]

18.    Credit Suisse was led for a number of years by CEO Brady Dougan, a former trader who had spent his career in the New York IB operation. Dougan installed New York investment bankers in nearly every senior position in the Bank. They, in turn, instilled the New York IB risk

---

[13]    *See Credit Suisse Group Special Committee of the Board Of Directors Report on Archegos Capital Management*, July 29, 2021 (the "Paul Weiss Report") available at: https://www.credit-suisse.com/about-us/en/reports-research/archegos-info-kit.html (last visited 7/17/2023).

[14]    *Id.*

[15]    FINMA Report at 49.

culture throughout the enterprise. When Dougan stepped down, and his successors and other senior leaders of Credit Suisse awoke to the existential danger posed by the New York IB culture, the investment bankers pushed back on and sabotaged efforts to reel in risk and their own remuneration. But the Defendants failed to take the necessary steps to fix the risk culture.

19.     Shortly before the Bank's collapse, new senior leadership resolved finally to address the problem by lopping off most of the investment bank through a spin-off, but by early 2023, it was too late. Credit Suisse failed before the divestment was completed, the victim of the "loss of trust that had accumulated over the years" and the leaders who caused it.

20.     The end for Credit Suisse, although long (gradual) in the making, came suddenly in March 2023. The accumulated "loss of trust" manifested in huge and accelerating asset outflows, as Credit Suisse's clients began to pull their assets out of the Bank.

21.     During the week of March 13, 2023, Credit Suisse reached its internal liquidity limit at the Swiss National Bank ("SNB"). On March 15, 2023, in an effort to stem the outflows, the Swiss government began to provide "extraordinary" liquidity assistance.

22.     Despite the provision of approximately $65.9 billion in liquidity support over a few days, outflows of client assets accelerated, caused by the erosion of trust. Clients pulled $75 billion in assets from Credit Suisse in the first quarter of 2023, bringing the total outflows, since October 2022, to over 15% of the Bank's total assets.[16]

23.     By the weekend of March 18–19, 2023, the Swiss government and FINMA determined they had to act immediately because, as Swiss Minister of Finance Karin Keller-Sutter

---

[16]   Hann Ziady, *Depositors pulled $75 billion from Credit Suisse as it veered toward collapse*, CNN Business (Apr. 24, 2023), https://www.cnn.com/2023/04/24/investing/credit-suisse-bank-withdrawals-total/index.html.

put it, "***Credit Suisse would not have survived Monday***" (*i.e.*, the next trading day).[17] By "mid-March 2023, there was an imminent threat of [Credit Suisse] becoming insolvent."[18] Credit Suisse "would have become insolvent without liquidity assistance from the SNB even before the weekend [of March 18-19]."[19] "Without this further support, CS would have become immediately insolvent by midday on Friday, 17 March 2023."[20] "

24.    The government and FINMA concluded they had but a few viable options for Credit Suisse: bankruptcy, resolution, nationalization, or a forced merger. This dire situation was caused by the accumulated loss of trust epitomized by years of misconduct, malfeasance, and managerial negligence perpetrated by the Defendants in breach of their duties—by the "arsonists." ***Under any of these scenarios—bankruptcy, resolution, nationalization, or forced merger—the AT1 bonds would have been wiped out.*** The Expert Group reached this same conclusion:

> The authorities had three options: resolve Credit Suisse according to the prepared plan, public ownership of Credit Suisse, and a merger with UBS. In all three scenarios, the SNB would have had to provide large amounts of liquidity and the federal government would have had to provide the SNB with guarantees for part of this liquidity. . . . ***In all cases, Credit Suisse AT1 bonds in the amount of around CHF 16 billion would have been written down.***

25.    The Swiss government and FINMA determined that a merger would be the option least disruptive to the Swiss state and its economy, and over that weekend, forced a merger of Credit Swiss into its longtime rival, UBS. To facilitate the merger, FINMA issued a Decree on March 19, 2023, declaring a so-called "Viability Event," and requiring Credit Suisse to recognize

---

[17]    Louise Guillot, *Swiss financial minister defends rushed takeover of Credit Suisse*, Politico (Mar. 25. 2023), https://www.politico.eu/article/swiss-finance-minister-defends-rushed-takeover-of-credit-suisse.

[18]    FINMA Report at 6.

[19]    FINMA Report at 65.

[20]    FINMA Report at 37.

the inevitable – the write-down of all outstanding AT1 bonds to zero.

26.    While the FINMA Decree was the ultimate instrumentality by which the AT1 bonds were wiped out, it was the *result* of the bank collapsing, not the *cause* of its collapse (and resulting write-down of the AT1 bonds). The bonds would have been wiped out under any of the options considered that fateful March weekend, *i.e.*, bankruptcy, resolution, "temporary public ownership (TPO) [*i.e.*, nationalization] [or] a takeover."[21] Credit Suisse was going over the cliff that weekend regardless of method—whether by merger, resolution, TPO, or bankruptcy—and the holders of Credit Suisse AT1 bonds were going to see their investments wiped out under any scenario.

27.    FINMA's CEO confirmed that the AT1 bonds would have been wiped out regardless of the scenario:

> Allowing the bankruptcy of troubled lender Credit Suisse would have crippled Switzerland's economy and financial center and likely resulted in deposit runs at other banks, Swiss regulator FINMA said Wednesday.
>
> The bankruptcy plan, FINMA CEO Urban Angehrn said in a statement, was "de-prioritised early on due to its high tangible and intangible costs." It would have **erased the holding company Credit Suisse Group, along with the parent bank Credit Suisse AG** and its branches, while retaining the Credit Suisse (Schewiz) AG entity because of its "systemic importance."
>
> \*        \*        \*
>
> Among FINMA's other options, the resolution recourse would have downsized Credit Suisse, with the Swiss National Bank supplying liquidity assistance loans backed by a federal default guarantee. **The bank's equity and AT1 bonds would still have been written down to zero**, with other bondholders being bailed in.[22] (Emphasis added).

---

[21]    Louise Guillot, *Swiss financial minister defends rushed takeover of Credit Suisse*, Politico (Mar. 25. 2023), https://www.politico.eu/article/swiss-finance-minister-defends-rushed-takeover-of-credit-suisse.

[22]    Ruxandra Iordache, *Switzerland faced a full-scale bank run if Credit Suisse went bankrupt, Swiss regulator argues*, CNBC (Apr. 5, 2023), https://www.cnbc.com/2023/04/05/switzerland-faced-a-bank-run-if-credit-suisse-went-bankrupt-swiss-regulator.html.

The FINMA Report reached the same conclusion, that under any scenario – merger with UBS, resolution/restructuring, nationalization or bankruptcy – the AT1 bonds would have been completely wiped out that weekend.[23]

28.    Defendants' negligent breaches of their statutory duties brought the Bank to that cliff's edge from which there was no return.

29.    The peculiar nature and characteristics of the Credit Suisse AT1 bonds are important elements of this story. These bonds were at the bottom of Credit Suisse's capital structure and were structured so they could be extinguished in certain circumstances involving severe, possibly existential, financial stress, when the Bank's independent existence was immediately threatened. "The mechanism of AT1 instruments as going concern instruments results in AT1 creditors having to bear losses before and independently of the opening of formal restructuring proceedings, i.e. even before a bank's shareholders."[24] But until such a situation developed, *i.e.*, the Bank itself was going over a cliff, the AT1 bond holders were paid in full and on time, and the market valued the bonds at or near par. Thus, AT1 bonds were exposed to "cliff risk," *i.e.*, the kind of long-term management failure that happened here, resulting in loss of trust and the collapse of the Bank.

30.    That the loss of trust was gradual before it became sudden does not detract from its reality or diminish the chain of causation. Philosopher and social reformer Jacob Riis expressed this same concept over a century ago with these words:

> When nothing seems to help, I go and look at a stonecutter hammering away at his rock, perhaps a hundred times without as much as a crack showing in it. Yet at the hundred and first blow it will split in two, and I know it was not that last blow that did it, but all that had gone before.

---

[23] FINMA Report at 19-20.

[24] FINMA Report at 39.

## II.        JURISDICTION AND VENUE

31.    This Court has jurisdiction over this action, pursuant to 28 U.S.C. § 1332, because: (a) at least one member of the Class is a citizen of a state different from any defendant; and also because (b) at least one member of the Class is a citizen or subject of a foreign state and any defendant is a citizen of a state. In addition: (a) the Class consists of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to this claim.

32.    The claims asserted in this action arise under Swiss substantive law (and not under the laws of any State).

33.    This action is not based on fraud or false or misleading statements by Credit Suisse in connection with the purchase or sale of securities, but rather, this action is based on Defendants' conduct in breach of their statutory duties. The exception in 18 U.S.C. § 1921(c) regarding the purchase or sale of securities does not apply. This claim is for bondholders who suffered damages and/or losses due to Defendants' negligent breach of duty.

34.    This Court has personal jurisdiction over Defendants, as described more fully below, because they are citizens or domiciliaries of New York; had continuous and systematic contacts with New York; engaged in conduct that had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in New York; and/or purposely availed themselves of the laws of the New York. This Court has specific jurisdiction of the defendants and the claim because of the affiliation between the forum and the specific controversy alleged herein.

35.    While brought under Swiss substantive law, New York is the most appropriate forum for this action. Most of the Defendants live or work in New York. The conduct complained of happened primarily in New York. Discovery will largely be New York-focused.

36.     As a former Credit Suisse CEO told the United States Senate, Credit Suisse "has deep roots in the United States. Parts of today's Credit Suisse date back to the First Boston Corporation, a U.S. firm that has its roots going back to the 18th Century."[25] The underlying cause of Credit Suisse's demise began in, and spread from, New York. The bad risk culture that ultimately brought down the Bank originated in CS First Boston, which ultimately became Credit Suisse's IB Division. That Division has been run out of New York and was headed or co-headed by New Yorkers continuously from 2004 until September 2022. This is a New York-centric case.

37.     The IB Division, with its roots in Wall Street, was the principal source of Credit Suisse's toxic culture that valued short-term gain over long-term trust and led to countless scandals and billions of dollars of U.S. government penalties—and Plaintiff's and the other Class members' losses, as alleged herein.

38.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim herein occurred in this District, multiple Defendants reside in this District, and most, if not all, Defendants are subject to the Court's personal jurisdiction with respect to the action.

### III.    PARTIES

**Plaintiff**

39.     Plaintiff Hohimer Wealth Management LLC ("HWM") is a holder of AT1 bonds. HWM is a Washington Limited Liability Company, with its principal place of business in the State of Washington. HWM held Credit Suisse AT1 bonds during the Class Period as defined herein and has suffered direct damage and/or loss due to the conduct complained of herein.

---

[25] *Offshore Tax Evasion: The Effort to Collect Unpaid Taxes on Billions in Hidden Offshore Accounts Before the Permanent Subcomm. on Investigations of the of the S. Comm. on Homeland Sec. & Governmental Affairs*, 113th Cong. 20 (2014).

**Defendants**

40.    Defendant Brady W. Dougan ("Dougan") is a citizen of the United States and of New York. He resides in this District. Dougan was CEO of Credit Suisse Group AG from May 2007 until June 2015. Dougan joined First Boston in 1990. He was the Head of the Equities Division at CSFB for five years before he was appointed Global Head of the Securities division in 2001. From 2002 to July 2004, he was Co-President, Institutional Services at CSFB, and from 2004 until the merger with Credit Suisse in May 2005, he was CEO of CSFB. From May 2005 to year-end 2005, he was CEO of the Credit Suisse First Boston division at Credit Suisse. In 2006 and 2007, prior to becoming CEO of Credit Suisse Group AG, he was CEO of the Bank's IB Division. Dougan, under pressure, announced his resignation from Credit Suisse in February 2015. He remained in office until June 2015, then stepped down. His legacy, and that of his New York investment banker lieutenants, weighed on Credit Suisse until the ignominious end in March 2023.

41.    Defendant Eric Varvel ("Varvel") is a citizen of the United States and of New York. Varvel, a Dougan protégé and CSFB alumnus, became acting head of Credit Suisse's Investment Banking Division in September 2009 when the prior head of Investment Banking, Paul Calello (another New Yorker, Dougan protégé, and CSFB alumnus) stepped down for health reasons. Varvel removed the "acting" tag and formally became CEO of Investment Banking in July 2010. He remained in that position until October 2014. Varvel was appointed Global Head of Asset Management (within the Wealth Management Division) in 2016. Varvel, who had management responsibility, was ousted as head of the asset management unit shortly after yet another Credit Suisse scandal was revealed in March 2021.

42.    Defendant James L. Amine ("Amine") is a citizen of the United States and of Connecticut. He worked in New York for many years, including when he was employed by CSFB

(1997-2005) and Credit Suisse (2005-2019). He also worked in New York prior to his tenure at CSFB, as a partner at Cravath, Swaine & Moore. Amine was head or co-head of IB from October 2014 – November 2019.

43.     Defendant Timothy P. O'Hara ("O'Hara") is a citizen of the United States and of New York. He was a long-time Dougan protégé. He was co-head of IB from October 2014 to November 2015, then became head of Global Markets from November 2016 until September 2016 when he was forced out by newly installed Credit Suisse CEO Tidjane Thiam after $1 billion in Collateralized Loan Obligations and distressed credit, for which he was responsible, had to be written off. Thiam publicly complained that O'Hara's group had concealed these risky positions from senior management.

44.     Defendant David Miller ("Miller") is a citizen of the United States and of New York. He has worked in New York for many years. He was head of IB from November 2019 until August 2020. Thereafter, he remained at Credit Suisse in senior investment banking roles.

45.     Defendant Brian Chin ("Chin") is a citizen of the United States and of New York. Chin was head of Global Markets from September 2016 until August 2020, when he became head of IB. Chin was fired in March 2021 after the Archegos disaster, for which he was partly responsible.

46.     Defendant Christian Meissner ("Meissner") is a citizen of Austria who currently lives in New York and London. He worked for Credit Suisse, with residency in New York, from November 2020 until September 2022. He was CEO of the Investment Bank, with his headquarters in New York, from May 2021 until September 2022.

47.     Defendant Gaël de Boissard ("Boissard") is a French citizen. He worked at CSFB/Credit Suisse from 2001 until October 2015. Boissard, a Dougan protégé, was co-head of

IB from January 2013 until October 2015, when he left the Bank, forced out by new CEO Thiam. Following his departure, the IB had to take a $1 billion write-off related to Collateralized Loan Obligations and distressed credit. Boissard worked primarily in the London office but spent a significant amount of time conducting Credit Suisse business in New York where his co-heads of IB were located. From 2001 until January 2013, he held senior positions within IB.

48.    Defendant Urs Rohner ("Rohner") is a Swiss citizen. Rohner left private law practice in 2004 to join Credit Suisse as General Counsel. He became Vice Chairman of the Credit Suisse Board of Directors in 2009 and was elevated to Chairman (a full-time executive position) in 2011. He stepped down as Chairman in 2021. Rohner is a member of the New York Bar, having first been admitted in or about 1990 when he practiced in New York City with Sullivan & Cromwell. Rohner has, and continues to have, numerous contacts with New York. He owns a home in Manhattan. He spent a significant amount of time in New York in connection with his work for Credit Suisse.

49.    Defendant Tidjane Thiam ("Thiam") is a French and Ivorian citizen. According to his LinkedIn page, he currently resides in New York City.[26] Thiam became CEO of Credit Suisse in 2015, replacing Dougan and remained in that role until February 2020. Thiam recognized soon after becoming CEO that the Bank's culture of lax risk management "was a problem."[27] Thiam called for a "cultural change" after Credit Suisse was forced to write down over $1 billion on Collateralized Loan Obligations and distressed credit. Thiam noted that "'[c]ultural issues can't be

---

[26]    Tidjane Thiam, LinkedIn, https://www.linkedin.com/in/tidjane-thiam-652284140 (last visited August 25, 2023).

[27]    Joshua Franklin, *Credit Suisse faces tough questions after $1 billion write-downs*, Reuters (Apr. 4, 2016), https://www.reuters.com/article/us-credit-suisse-writedowns/credit-suisse-faces-tough-questions-after-1-billion-write-downs-idUSKCN0X12F9.

resolved overnight'" and that "'[i]t will take a lot of continued effort to deal with those issues.'"[28] Thiam initiated a "radical" restructuring of Credit Suisse that "began with shock and awe as [he] recast a bank that had come to be dominated by its markets trading businesses into one that would be dominated by its private banking and wealth management operations instead."[29] But ultimately, Thiam failed to roll back the influence of the U.S.-focused IB or to materially change the lax risk management culture. Worse, under Thiam, the risk function was downsized and de-emphasized with disastrous results.

50. Defendant Thomas Gottstein ("Gottstein") is a Swiss citizen. Gottstein became CEO when Thiam was forced out in February 2022. He had numerous contacts with New York and made several visits to the Credit Suisse IB headquarters in New York while he was CEO. Gottstein, like his predecessor Thiam, recognized the cultural issues caused mainly by the U.S.-focused IB and instituted another "restructuring." But Gottstein, like Thiam, was unable to rein in the excesses of the IB or to institute a disciplined approach to risk. The Greensill and Archegos disasters broke during Gottstein's term as CEO and in July 2022 he was forced out of Credit Suisse.

51. Defendant Sir António Horta-Osório ("Horta-Osório") is a Portuguese and British citizen. Horta-Osório became Chairman of Credit Suisse's Board of Directors in April 2021. Almost immediately, he announced plans for another "restructuring." He stated his intention soon after he arrived to "take a look at the bank's risk management and culture following recent crises,

---

[28] Owen Walker & Stephen Morris, *Former Credit Suisse chief Tidjane Thiam defends his record*, Financial Times (Nov. 29, 2022).

[29] Peter Lee, *The master strategist: How Tidjane Thiam brought a revolution to Credit Suisse*, Euromoney (July 31, 2018), https://www.euromoney.com/article/b199lzvsyn5m0j/the-master-strategist-how-tidjane-thiam-brought-a-revolution-to-credit-suisse.

as well as reviewing strategic options for the bank."[30] In November 2021, he "unveiled a new strategy focusing on risk management and doubling down on its wealth management business as it seeks to pursue a more sustainable growth."[31] The new strategy was, he said, designed to "'rebuild a culture of trust'" while acknowledging that there was "'no quick fix'" and it would be a "'continuous effort.'"[32] However, having set out to rebuild trust, he was forced to resign in January 2022 over his own ethical lapses. Horta-Osório had numerous contacts with New York and made several visits to the Credit Suisse headquarters in New York while he was Chairman.

52.    Defendant Robert S. Shafir ("Shafir") is a citizen of the United States and of New York. Shafir was a close associate of Dougan, who installed him as a member of Credit Suisse's Executive Board in 2007. He was the Joint Head of Private Banking and Wealth Management and the Regional CEO for the Americas from 2012 until 2015 when he left Credit Suisse. He was the CEO of Asset Management from 2008 to 2012 and the CEO of the Americas region from 2007 to 2010.

53.    Defendant Lara J. Warner ("Warner") is a citizen of the United States and of New York. She maintained a home in Pelham, New York, even during the years she worked in Zurich, Switzerland. Warner was Chief Compliance and Regulatory Affairs Officer of Credit Suisse from October 2015 until February 2019, then became Chief Compliance and Risk Officer from February

---

[30]    *New Credit Suisse chairman eyes risk and culture, strategic options*, Reuters (Apr. 30. 2021), https://www.reuters.com/business/finance/new-credit-suisse-chairman-eyes-risk-culture-strategic-options-2021-04-30/.

[31]    *Credit Suisse focuses on risk management in restructuring plan*, The Asset (Nov. 4, 2021), https://theasset.com/index.php/article/45338/credit-suisse-focuses-on-risk-management-in-restructuring-plan.

[32]    Farah Ghouri, *Credit Suisse chair Antonio Horta-Osorio says largest investors back bank overhaul*, City A.M. (Nov. 7, 2021), https://www.cityam.com/credit-suisse-chair-antonio-horta-osorio-says-largest-investors-back-bank-overhaul/.

2019, when those positions were combined, until she was fired in April 2021 in the wake of the Archegos disaster. Warner had little or no background in risk management, having come from a background as an analyst for the IB Division. Warner, with the acquiescence of her then-superiors, hollowed out the risk group, as found by the Paul Weiss Report. Soon after she was fired, Credit Suisse hired back many of the senior risk managers she had previously terminated or forced out.

54.    Defendant Richard E. Thornburgh ("Thornburgh") is a citizen of the United States and of Florida. A life-long investment banker, he spent many years living and working in New York City and continues to regularly conduct business in New York. Thornburgh was a director of Credit Suisse Board of Directors from 2006 until 2016 and was Vice Chairman of the Board from 2014 until 2016. He was a member of the Risk Committee of the Board from 2006 until 2016 and chaired that committee from 2009 until 2016. He was paid $420,000 annually for serving as chair of the Risk Committee, in addition to his other Board compensation (which in the aggregate exceeded $1 million for 2016, his last full year on the Board). Thornburgh began his investment banking career in New York with First Boston. From 1995 until 2005, he held a series of senior executive positions at CSFB and with Credit Suisse after it absorbed CSFB, including Chief Risk Officer. Thornburgh lived and worked in New York City the entire time he held his Board position. Thornburgh was uniquely well-placed to observe and exercise Board-level oversight with respect to the IB Division and its culture, compensation, and risk practices.

55.    Defendant Andreas Gottschling ("Gottschling") is a German citizen. Gottschling was a Credit Suisse director from 2017 to 2021. From 2018 to 2021, he served as Chairman of the Risk Committee. Gottschling was chair of the Risk Committee when the Greensill and Archegos disasters blew up. He stepped down from the Board in February 2021, just before the 2021 Annual General Meeting when it became apparent that major institutional investors opposed his reelection

to the Board. As Chair of the Risk Committee, Gottschling had numerous contacts with New York in connection with the events alleged herein.

56.    Defendant Michael Klein ("Klein") is a citizen of the United States and of New York. Klein, a life-long investment banker, was a Credit Suisse director from 2018 until 2022. He served on the Board's Risk Committee from 2018 until 2021. In February 2023, Credit Suisse announced that Klein had become a member of the Executive Board and that he would lead a spinoff of most of the IB Division into a newly reconstituted CS First Boston.

57.    Defendant Noreen Doyle ("Doyle") is a citizen of the United States and of New York, as well as Ireland. She was a Credit Suisse director from 2004 until 2017. Doyle was Vice-Chair and Lead Independent Director of the Board from 2014 until 2017. She was a member of the Risk Committee during the following periods: 2004-2007, 2009-2014, and 2016-2017.

## IV.    STATEMENT OF FACTS

### A.    Background Facts

**Trust Is Critical for a Financial Institution, and Directors and Managers of Financial Institutions Are Duty-Bound to Protect Trust and Confidence in the Institution.**

58.    "The whole principle of banking is built on trust."[33]

59.    Credit Suisse's webpage, "Trust & Expertise," recognizes the critical and interconnected roles of trust and compliance:

**Financial integrity**

Compliance operates as an independent Executive Board-level function at Credit Suisse, underscoring the high level of importance that we assign to this topic. The function's mandate is to oversee compliance matters for Credit Suisse, and it includes being a proactive, independent function that partners with the businesses

---

[33]    Jannie Rossouw, *When banks go bust: the four factors at play – trust, confidence, contagion and systemic risk,* The Conversation (Mar. 22, 2023), https://theconversation.com/when-banks-go-bust-the-four-factors-at-play-trust-confidence-contagion-and-systemic-risk-202382.

by continuously challenging and supporting them to effectively manage compliance risk.

Recognizing the critical role of employees in helping to preserve financial integrity, we aim for the highest standards of personal accountability and ethical conduct from each member of our workforce. Credit Suisse employees at all levels of the organization, as well as the members of the Board of Directors, are obligated to adhere to Credit Suisse's Code of Conduct.[34]

60.    Credit Suisse's 2017 Annual Report stated that trust is essential in the finance business: "In finance, trust is essential to successfully pursue business opportunities."

61.    In the same Annual Report, then-Chairman Urs Rohner stated: "Unquestionably, trust is the cornerstone of any long-term business relationship. It has traditionally been the very foundation of banking and the basis on which we operate."

62.    "Trust is the cornerstone of the banking system. It is a fundamental aspect that underpins the relationship between banks, customers, and other stakeholders. . . . Trust is necessary for maintaining the stability of the financial system, fostering economic growth, and ensuring the efficient functioning of the banking sector. . . . The relationship between customers and their banks is built on the premise of trust. Customers trust banks to safeguard their deposits, facilitate transactions, and provide credit for personal and business purposes. This trust is primarily founded on the belief that banks are competent and reliable institutions that adhere to a set of rules and regulations designed to protect the interests of their customers. . . . ***However, when trust is compromised, the consequences can be severe. A loss of trust can lead to bank runs, as depositors rush to withdraw their funds, fearing that the bank may become insolvent. This can cause severe***

---

[34]    *Trust  &  Expertise*,  Credit  Suisse,  https://www.credit-suisse.com/about-us/en/our-company/corporate-responsibility/banking/trust-expertise.html (last visited June 20, 2023).

*liquidity problems for banks, leading to a potential collapse of the financial system*."[35]

### The Critical Importance of Risk Culture

63.    The critical importance to financial institutions of a good, healthy "risk culture" is well recognized. Standard & Poor's notes that "a company's risk-management culture is the foundation for its ERM (enterprise risk management) processes."[36] Where, as here, the bank's risk management systems (controls) are inadequate, it is even more important to instill and maintain a healthy risk culture. It has been said that the "aim of risk culture is to close the gap between risk exposure resulting from the business model and the capabilities of the existing quantitative risk management."[37]

64.    The Institute of International Finance ("IFF"), the global association of the financial industry, defines risk culture as follows: "The norms of behavior for individuals and groups within an organization that determine the collective ability to identify and understand, openly discuss and act on the organization's current and future risks."[38] The IFF also stated that "both firms and supervisors are now focused on culture as crucial to whether risk is handled appropriately or not."

65.    According to the global consulting firm McKinsey & Co.: "Risk culture is at the heart of the human decisions that govern the day-to-day activities of every organization. It is relevant to all parts of the organization, not just risk managers. And when it goes wrong, as in the

---

[35]    Josh Luberisse, *The Importance of Trust in the Banking System*, Medium (Apr. 29, 2023), https://medium.com/fortis-novum-mundum/the-importance-of-trust-in-the-banking-system-2359469baecb.

[36]    *Risk Culture: Resources for Practitioners*, The Institute of Risk Management (2012), https://www.treasurers.org/ACTmedia/IRM_riskculture_full_Oct12.pdf

[37]    *No Comprehensive Risk Management Without Risk Culture*, https://www.bankinghub.eu/finance-risk/no-comprehensive-risk-management-without-risk-culture

[38]    "Reform in the Financial Services Industry: Strengthening Practices for a More Stable Industry," Institute of International Finance, December 2009.

SocGen rogue trading scandal in 2008 or the Challenger Space Shuttle disaster in 1986, the consequences can be devastating and even fatal. Failures such as fraud, the collapse of complex derivatives positions, safety breaches, operational disasters, and over-leveraging have their origin in flaws in unique organizational cultures that allowed particular risks to take root and grow."[39]

66.    The Financial Stability Board, an international body chartered by the G20 governments that monitors and makes recommendations about the global financial system, has observed: "Weaknesses in risk culture are often considered a root cause of the global financial crisis, headline risk and compliance events. A financial institution's risk culture plays an important role in influencing the actions and decisions taken by individuals within the institution and in shaping the institution's attitude toward its stakeholders, including its supervisors."[40]

67.    A New York Fed white paper asserts: "Root cause analyses of many recent cases of misconduct in the financial sector . . . suggest that misconduct is not just the product of a few individuals or bad processes, but is the result of wider organizational breakdowns. . . . [T]here is a growing academic literature that focuses on a firm's organizational culture as a key driver of behavior and resultant misconduct risk. In this framing, culture is the set of attitudes, beliefs, practices, and values that mitigate or enhance misconduct risk."[41]

68.    A European Central Bank Supervision Newsletter entitled "Strong Risk Culture — Sound Banks" states, "Weaknesses in risk culture may signal problems in the future, such as

---

[39]    "Taking Control of Organizational Risk Culture," McKinsey Working Papers on Risk, February 2012, https://www.mckinsey.com/~/media/mckinsey/dotcom/client_service/risk/working%20papers/16_taking_control_of_organizational_risk_culture.pdf.

[40]    "Guidance on Supervisory Interaction with Financial Institutions on Risk Culture," Financial Standards Board, April 2014, https://www.fsb.org/wp-content/uploads/140407.pdf

[41]    "Misconduct Risk, Culture, and Supervision," Chaly, *et al*., November 2017, https://www.newyorkfed.org/medialibrary/media/governance-and-culture-reform/2017-whitepaper.pdf

financial losses or misconduct. Conversely, a bank's strong financial position could be misleading if there is an underlying problem with culture and conduct. Therefore, even in periods of solid financial health, strong risk culture can be essential in preventing future losses which could damage the reputation of a bank."[42]

69.     According to the Institute of Risk Management: "Risk culture significantly affects the capability to take strategic risk decisions and deliver on performance promises. Organisations with inappropriate risk cultures will inadvertently find themselves allowing activities that are totally at odds with stated policies and procedures or operating completely outside these policies. An inappropriate risk culture means not only that certain individuals or teams will undertake these activities but that the rest of the organization ignores, condones or does not see what is going on. At best this will hamper the achievement of strategic, tactical and operational goals. At worst it will lead to serious reputational and financial damage."[43]

**Risk Management, including Risk Culture, is a Core Responsibility of the Board and Senior Management.**

70.     Because of the centrality and critical importance of risk culture to the success or even survival of a financial institution, risk management—including risk culture—is a core responsibility of the Board of Directors and senior management (in this case, the Executive Board).

71.     The Bank for International Settlements ("BIS"), founded in 1930 and owned by 63 central banks from around the world, articulates "Principle 1" of its "Fundamental Principles of Operational Risk Management" as follows: "The board of directors should take the lead in

---

[42]  "Strong Risk Culture — Sound Banks," European Central Bank, February 2023, https://www.bankingsupervision.europa.eu/press/publications/newsletter/2023/html/ssm.nl230215_3.en.html#:~:text=Risk%20culture%20is%20a%20set,on%20the%20risks%20they%20take.

[43]  "Risk Culture Under the Microscope: Guidance for Boards," Institute of Risk Management, 2012, https://www.theirm.org/media/8447/risk_culture_a5_web15_oct_2012-executive-summary.pdf

establishing a strong risk management culture. The board of directors and senior management should establish a corporate culture that is guided by strong risk management and that supports and provides appropriate standards and incentives for professional and responsible behaviour. In this regard, it is the responsibility of the board of directors to ensure that a strong operational risk management culture exists throughout the whole organization."[44]

72.    As a 2017 New York Fed white paper noted, "[f]irms and their boards of directors have primary responsibility to improve a firm's culture and reduce misconduct risk."[45]  Further, "the board, directly and through its committees, is responsible for overseeing strategy, risk, and performance. Recent scandals and other developments have made it increasingly apparent that culture is linked to all three of these oversight areas and that culture is a key asset. Accordingly, culture-related risk is a key risk that calls for board oversight."[46]

73.    "Risk culture is the shared values, attitudes, competencies, and behaviors throughout the bank that shape and influence governance practices and risk decisions. As a subset of corporate culture, risk culture pertains to the bank's risk approach and is critical to a sound risk governance framework. To promote a sound risk culture:

- the board should take the lead in establishing the tone at the top by promoting risk awareness within a sound risk culture. The board should convey its expectations to all employees that the board does not support excessive risk taking and that all employees are responsible for operating within the established risk appetite and limits, and

---

[44]  "Principles for the Sound Management of Operational Risk," Bank for International Settlements, June 2011, https://www.bis.org/publ/bcbs195.pdf

[45]  "Misconduct Risk, Culture, and Supervision," Chaly, *et al.*, November 2017,  https://www.newyorkfed.org/medialibrary/media/governance-and-culture-reform/2017-whitepaper.pdf

[46]  "Corporate Culture Risk and the Board," Harvard Law School Forum on Corporate Governance, April 20, 2018, https://corpgov.law.harvard.edu/2018/04/20/corporate-culture-risk-and-the-board/.

- senior management should implement and reinforce a sound risk culture and provide incentives that reward appropriate behavior and penalize inappropriate behavior. Management should recognize, escalate, and address material risks and risk-taking activities exceeding the risk appetite in a timely manner."[47]

**The Nature and Characteristics of AT1 Bonds**

74.     AT1 bonds are hybrid securities issued by banks that meet the criteria under Basel III for Tier 1 regulatory capital.[48] A bank's common equity and its AT1 bonds together constitute its Tier 1 (or "going concern") capital. AT1 bonds are, by definition, *subordinated* to depositors, general creditors, and subordinated debt of the bank, meaning they are at the bottom of the bank's capital structure, sitting (in general) just above equity. And, they must have a *"principal loss absorption"* feature whereby they are either (depending on the specific terms of issue) (i) converted to common shares at a pre-set trigger point or (ii) written down to allocate losses to the instruments at the pre-set trigger point. The conversion or write-down is triggered when the bank's Common Equity Tier 1 (CET1) ratio drops below a specified point. In addition, the bank's regulator can under certain circumstances trigger a conversion or write-down without regard to whether the pre-set trigger points have been crossed.

75.     Moreover, because of their position in the bank's capital structure, AT1 bonds are at risk when the bank comes under severe financial distress, whether or not they have been triggered. They are designed to ensure that bondholders bear losses *before* equity holders in certain circumstances. And in all events, they are subordinated to all creditor claims, meaning in a

---

[47]   Corporate Risk and Governance, Ver. 2, July 2019, Office of the Comptroller of the Currency, https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/ files/corporate-risk-governance/pub-ch-corporate-risk.pdf.

[48]   AT1 bonds are considered hybrid because they are treated as debt, but may, under certain circumstances, be converted to equity.  The Credit Suisse AT1 bonds, however, did not have the conversion-to-equity feature; they were subject to write-down only.

bankruptcy or resolution scenario, the AT1 bonds are likely to be wiped out entirely (as would have happened in the specific case of Credit Suisse).

76.     The peculiar nature and characteristics of the Credit Suisse AT1 bonds meant that unless and until the Bank came under financial distress severe enough to threaten its continued independent existence, AT1 holders continued to be paid, and the market valued the bonds at or near par (adjusted for interest rate risk). Therefore, the multiple Credit Suisse scandals and losses, even as severe as the Archegos and Greensill scandals, had little apparent and immediate impact on AT1 bond pricing—or risk to the AT1 bonds, as assessed by the market—even as these scandals and losses caused immediate drops in the stock price. The chart below reflects Credit Suisse AT1 prices[49] over a period of years.



_____

[49]    There were several different issuances of AT1 bonds. *See* ¶ 204, *infra*.  The prices shown in this chart, and those in the next paragraph, reference the prices for the 7.5% Perpetual Tier 1 Capital Note, ISIN US225401AJ72.

77.    The price, however, reacted meaningfully when it started to appear that Credit Suisse itself was at severe risk as a going concern, *i.e.*, at risk of going over the cliff. The first chart below shows prices from September 2022 through March 2023. The second shows price movement in the days preceding March 19, 2023, when FINMA issued its Decree. Between March 10 and March 17, 2023, the price dropped like a rock, from 82 to 25, losing almost 70% in value *before* FINMA mandated that the AT1 bonds be written down to zero.





**Background Facts – History of the Credit Suisse Investment Bank**

78.    Credit Suisse was a Swiss bank that tried—ultimately unsuccessfully—to bolt on a New York investment bank. Credit Suisse's New York IB Division was the primary source of the bank's most significant publicly-reported scandals, and illegal and unethical conduct, over the past several years.

79.    The IB Division, with its roots in Wall Street, was the principal source of the toxic culture that valued short-term gain over long-term trust and led to countless scandals and billions of dollars of United States government penalties—and Plaintiff's and the other Class members' losses, as alleged herein.

80.    The traditional Swiss banking culture of Credit Suisse began to change when it invested in, and then acquired, the aggressive, Wall Street, deal-driven investment bank known as The First Boston Corporation ("First Boston"). Credit Suisse first invested in First Boston in the mid-1980s. In 1996, Credit Suisse took complete ownership of First Boston and rebranded it as "CS First Boston" or "CSFB."

81.     In 2000, CSFB paid $11.5 billion to acquire Wall Street firm Donaldson, Lufkin & Jenrette ("DLJ"), a famously aggressive shop known primarily for junk bonds and leveraged buyouts.

82.     CSFB, headquartered in New York, operated as a separate entity from Credit Suisse until 2005, when CSFB was merged into Credit Suisse. The next year, Credit Suisse dropped the First Boston/CSFB branding, as the former CSFB became the Credit Suisse IB.

83.     But, while the First Boston name may have disappeared, First Boston's aggressive, risk-taking culture—which incentivized unethical, sometimes criminal, behavior in the pursuit of short-term gains leading to lavish pay packages for its traders and executives—most certainly did not. In fact, it became the ***dominant culture*** at Credit Suisse, especially after former CSFB trader Brady Dougan became CEO in 2007 and brought with him into senior management an entire cadre of CSFB alumni.

84.     As the Financial Times reported on March 24, 2023: "First Boston's high-risk culture pervaded through Credit Suisse's investment bank for the next three decades."[50]

85.     Beginning in 2007, Credit Suisse's culture became dominated by New York investment bankers. The outgrowth of that toxic, high-risk culture was a string of scandals caused by the chase for profits (and bonuses) outweighing risk management. From the beginning of defendant Brady Dougan's tenure starting in 2007, and up to the present, even though new CEOs and the different Chairmen of the Credit Suisse Board of Directors promised sweeping overhauls and cultural changes, Credit Suisse was unable to change the New York IB Division's penchant for aggressive, reckless deal making and the abject failure to ensure adequate risk management

---

[50]   *Credit Suisse: the rise and fall of the bank that built modern Switzerland*, Financial Times; https://www.ft.com/content/072dd83d-232d-4223-9428-801d4437b4f6.

and compliance with the law.

86.    Indeed, according to a 2012 Reuters article, "Americans and investment bankers . . . gained in influence with the overhaul, deepening a cultural tug-of-war between Credit Suisse's U.S.-focused investment bank and its less risky and more traditional Swiss-based private bank."[51]

87.    The investment bankers—the New Yorkers—won that fight. The ghost of CSFB haunted Credit Suisse for years and finally brought it down.

88.    Beginning with the Dougan era, when former CSFB bankers from New York came to dominate Credit Suisse and infuse it with their culture of lax risk management and ethically challenged conduct in the pursuit of short-term profit and the quarterly or annual bonuses that were tied to this short-term outlook, and continuing through successive administrations that proved unequal to the task of materially changing that culture, the Bank squandered the trust it had built over many decades.

89.    The "arsonists" in charge of Credit Suisse's risk culture—directors, CEOs, and members of the Executive Board, especially those leading (among others) IB and the risk function—caused its ultimate death spiral and collapse.

**B.    The Brady Dougan Era—The New York Investment Bankers Take Control**

90.    In 2007, only months after CSFB had been merged into Credit Suisse, former CSFB trader Brady Dougan (a New Yorker) became CEO of Credit Suisse. He brought numerous CSFB alumni with him into the senior ranks of Credit Suisse management.

---

[51]    Katherine Bart, *Credit Suisse boss under pressure despite outsmarting rival*, Reuters (Dec. 3, 2012), https://www.reuters.com/article/creditsuisse-ceo/credit-suisse-boss-under-pressure-despite-outsmarting-rival-idUSL5E8MU8HS20121203.

91.     By 2008, six of the eleven members of the Credit Suisse Executive Board had come out of CSFB, including (in addition to CEO Dougan) the heads of Private Banking, Investment Banking, and Asset Management, as well as the Chief Risk Officer and the head of Credit Suisse Europe, Middle East, and Africa.

92.     Dougan's acolytes were placed in positions where, by example and through incentives, they were able to inject their ethically challenged "Wall Street boys" culture, with its emphasis on personal profit stemming from outsized corporate risk, into the bloodstream of the bank as a whole. Most of these CSFB "gunslingers" were New Yorkers. And the domination of IB by New Yorkers never changed. Of the nine heads of the Investment Banking Division since it was absorbed by Credit Suisse in 2004, eight were New Yorkers.[52]

93.     During Dougan's time leading Credit Suisse as CEO, the power and influence of the IB Division, and of Dougan's disciples, grew.

94.     In 2012, Dougan orchestrated an internal reorganization that increased the influence of the IB Division while installing a Dougan lieutenant—Defendant Shafir, whose background was in investment banking—as co-head of the other Division (Private Banking and Wealth Management). Three of the four divisional co-heads—the top four operating executives under CEO Dougan—were Dougan's people with investment banking pedigrees, while only one of the four was a Swiss banker.

---

[52]  Defendants Dougan, Varvel, Amine, O'Hara, Miller, Chin, and Meissner—all New Yorkers—each ran the Investment Banking Division at some point between 2004 and 2022. Paul Calello, a New Yorker who passed away in 2010, also ran the Investment Banking Division. The sole outlier, Defendant de Boissard, a French citizen appointed by Dougan, acted for a time as co-head of the Investment Banking Division (along with New Yorkers) from his office in London.

95.    As a result, the risk-taking, ethically challenged, CSFB culture pervaded not only the Investment Banking Division where it started, but also continued to spread throughout the Bank.

96.    Indeed, Defendant Dougan and his lieutenants overhauled Credit Suisse. As noted in a *Reuters* article in 2012, "Americans and investment bankers . . . gained in influence with the overhaul, deepening a cultural tug-of-war between Credit Suisse's U.S.-focused investment bank and its less risky and more traditional Swiss-based private bank."[53]

97.    Dougan's predecessor as CEO, Oswald Gruebel, has said that Dougan "was only interested in investment banking" and that "[p]rivate banking or Swiss business were not a priority for Dougan." These criticisms are in line with prior knocks on Dougan from the Swiss bankers, who complained that he spent far too much time while CEO in New York, away from Zurich, and that he failed to learn German.

98.    Dougan also instituted or approved certain "profit-sharing schemes" and a program of huge "bonuses"—often in the form of participation interests in temporarily undervalued securities that the New York bankers expected, based on non-public information, to rebound and soar in value—that further worsened the risk culture by incentivizing risk-taking with the Bank's assets in order to create lavish bonus pools for the individual executives and traders.

---

[53]    In December 2012, a Reuters article observed that:

The Credit Suisse reorganisation contrasts with hometown rival UBS, which is abandoning most fixed-income activities in favour of its flagship private bank as tough Swiss capital rules begin eating into investment banking profits.

Instead, Dougan, who has long defended the unit he used to head from calls for a dramatic scaleback, announced a raft of measures that confirm his desire to keep Credit Suisse at the top table of investment banking.

*See supra* n. 40.

99.    Specifically, in furtherance of their me-first culture, Dougan and his IB lieutenants caused very lucrative custom derivatives to be created to fund bonus and deferred compensation pools for senior managers in the IB Division, known as "Partner Asset Facilities" or "PAFs." The first such structure (PAF1) was created in 2009 to fund the 2008 bonus pool for senior managers in the IB Division (but not other parts of Credit Suisse). It was funded with mortgage-backed securities ("MBS") at a time when such securities had fallen into disfavor. But the MBS that were hand-selected to fund the bonus pool were actually quite valuable; in fact, they increased in value by 72% in 2009 alone. The insiders, in other words, got some of the best and safest MBS the Bank had on its books—and at a significantly discounted price. Another pool (PAF2) was created to fund the 2011 bonus pool. It was funded with counter-party risk to enhance the Bank's regulatory capital position while providing a lucrative benefit to its executives. But PAF2 was ultimately disallowed by regulators because Credit Suisse directly or indirectly guaranteed the payments to the executives via a set of swaps that left the ultimate risk on Credit Suisse.

100.    When the PAF2 program was disallowed, Credit Suisse substituted a different fund entitled "Contingent Capital Awards." These securities were initially treated by Credit Suisse as Tier 1 bonds (*e.g.*, Credit Suisse Employee AT1 bonds) for regulatory purposes—that is, until January 12, 2023, when Credit Suisse informed FINMA that it wanted to remove these securities (but no others) from Tier 1 capital, which would have protected them from an AT1 write-down. It seems clear, in retrospect, that the senior Credit Suisse insiders, who were best placed to understand the existential danger the Bank was in and the likelihood of an AT1 write-down, were attempting to flee the ship before it sank. FINMA ultimately refused this preferential treatment for Credit Suisse insiders.

101.    The toxic New York culture manifested in a series of high-profile legal and financial disasters during, or arising from, the Dougan Era.[54]

102.    One example is the stew of greed, dishonesty, and managerial negligence flowing from the Asset-Backed Securities ("ABS") created and sold by the Structured Credit business within IB during 2005-2007. Dougan was either CEO of the IB Division, or CEO of Credit Suisse itself, during this entire fiasco.

103.    Traders in Credit Suisse's IB Division created and sold billions of dollars of ABS in the form of Residential Mortgage-Backed Securities ("RMBS"), Commercial Mortgage-Backed Securities ("CMBS"), and Collateralized Debt Securities ("CDO"), packaging and selling to third-party investors, such as pension plans, what the Bank later admitted was "'complete crap'" and "'[u]tter complete garbage.'"[55] Investors who purchased these securities from Credit Suisse lost untold billions of dollars. Many of these investors sued and recovered, in the aggregate, billions of dollars.

---

[54]  For example, a column in the Financial Times entitled "*Who Killed Credit Suisse*" opined:

"It started with Brady, says one Credit Suisse credit veteran. Dougan was CEO of Credit Suisse from 2007 and 2015. He was a good, fun, guy, but some say he started the rot. . . . 'Credit Suisse was full of meritocracy until Brady Dougan came along,' says another former MD.

Multiple sources say Credit Suisse was destroyed by overpaid mid-ranking men in suits. 'It was the MDs in middle management, not the producers,' says one. 'They were promoted through politics and it set a bad example and twisted the culture from being a meritocracy to one where politics was what mattered.

The change began with Brady Dougan, but it was seemingly solidified during the era of Tidjane Thiam, who may also therefore share a portion of blame."

Jerome Legras, *Who Killed Credit Suisse*, Financial Times (Mar. 21, 2023).

[55]  Press Release, U.S. Department of Justice, *Credit Suisse Agrees to Pay $5.28 Billion in Connection with its Sale of Residential Mortgage-Backed Securities* (Jan. 18, 2017), https://www.justice.gov/opa/pr/credit-suisse-agrees-pay-528-billion-connection-its-sale-residential-mortgage-backed.

104.    Credit Suisse itself was forced to pay massive fines and settlements, ultimately more than $9 billion, for its role in structuring and selling these toxic RMBS, CMBS, and CDO securities.

105.    One senior Credit Suisse Managing Director, Kareem Serageldin, pleaded guilty and went to prison for mismarking ABS securities in an attempt to increase his group's performance numbers.[56] The DOJ specifically noted that one of the reasons for this manipulation was "to secure significant year-end bonuses since the trading book's profitability was one of the factors in determining bonus amounts. [Serageldin's] 2007 bonus was over $1.7 million, and his Incentive Share Unit Award was more than $5.2 million."

106.    The bonuses and incentive awards available to ABS traders and other senior IB personnel encouraged unethical and illegal behavior, but that same behavior resulted in truly monumental bonuses and incentive awards for those at the top such as Dougan, who received $100 million in bonus and other compensation in 2010 alone.

107.    In 2014, the U.S. Department of Justice announced that Credit Suisse had pleaded guilty to a criminal conspiracy to aid and assist U.S. taxpayers in filing false returns. Credit Suisse paid a $2.6 billion fine.[57] As part of the plea agreement, Credit Suisse acknowledged that "it [had] operated an illegal cross-border banking business that knowingly and willfully aided and assisted thousands of U.S. clients in opening and maintaining undeclared accounts and concealing their

---

[56]    Press Release, U.S. Department of Justice, *Former Credit Suisse Managing Director Pleads Guilty In Connection With Scheme To Hide Losses In Mortgage-Backed Securities Trading Book* (Apr. 12, 2013), https://www.justice.gov/usao-sdny/pr/former-credit-suisse-managing-director-pleads-guilty-connection-scheme-hide-losses.

[57]    Press Release, U.S. Department of Justice, *Credit Suisse Pleads Guilty to Conspiracy to Aid and Assist U.S. Taxpayers in Filing False Returns* (May 19, 2014), https://www.justice.gov/opa/pr/credit-suisse-pleads-guilty-conspiracy-aid-and-assist-us-taxpayers-filing-false-returns.

offshore assets and income from the IRS." Credit Suisse's New York culture of risk-taking and lack of oversight permitted the repeated criminal acts committed by hundreds of employees. At the time, defendant Shafir—a Dougan protégé and former investment banker—was co-head of the Private Banking and Wealth Management Division, which was directly responsible for the criminal conduct and the fine.

108.    Prosecutors insisted on the corporate guilty plea and enhanced penalties were imposed because Credit Suisse's Directors and Officers permitted the obstruction of the criminal investigation.

109.    Credit Suisse's malfeasance led to even more trouble in New York when the New York State Department of Financial Services ("DFS") fined Credit Suisse $135 million for violating New York banking law, between 2008 and 2015, in connection with manipulating and rigging the foreign exchange currency market. Superintendent Maria Vullo of the DFS stated:

> "Certain Credit Suisse executives in the bank's foreign exchange unit deliberately fostered a ***corrupt culture*** that failed to implement effective controls in its foreign exchange trading business, which allowed the bank's foreign exchange traders and others to violate New York State law and repeatedly abuse the trust of their customers over the course of many years. . . . DFS will not tolerate any violations of law that threaten the integrity of our markets and undermine customer confidence."[58]

110.    And further, between 2012-2016, Credit Suisse's New York IB group created a series of corrupt and illegal transactions, known as the Tuna Boat Scandal, that ultimately led to Credit Suisse and the Investment Banking officials pleading guilty in criminal cases in the Eastern District of New York. Credit Suisse suffered penalties of $547 million, and a monitor was imposed

---

[58]    Press Release, New York State Department of Financial Services, *Dfs Fines Credit Suisse AG $135 Million for Unlawful, Unsafe and Unsound Conduct in Its Foreign Exchange Trading Business* (Nov. 13, 2017), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1711131.

on the Bank.

111.    The specific acts of misconduct, malfeasance, and managerial negligence described in the preceding paragraphs were among the most public and egregious of the Dougan Era, but they were emblematic of deeper and broader problems at Credit Suisse—a cascade of individual acts enabled by a toxic culture, created by top leadership and particularly the top IB leadership in New York—that was progressively resulting in loss of trust.

112.    Until the end of their tenures at Credit Suisse, Dougan and his lieutenant Shafir continued to foster the toxic risk culture and to enter into problematic transactions that eventually contributed to the bank's collapse. For example, during Dougan's tenure, Credit Suisse chose to "continue[] to do business with Archegos both during and after" Archegos (operating as Tiger Asia at the time) and the head of Archegos, Sung Kook "Bill" Hwang, pled guilty to federal wire fraud charges and settled insider trading allegations with the SEC in 2012 and "were banned from trading securities in Hong Kong for four years" in 2014. *See* Paul Weiss Report at 3-4.  Indeed, due to the culture of non-compliance fostered by Dougan, Paul Weiss could uncover "no evidence that [Credit Suisse] applied any additional scrutiny to Tiger Asia or Hwang in response to these matters." *Id*. at 4.

## C.    Tidjane Thiam Fails to Right the Ship—"Cultural Issues Can't Be Resolved Overnight"

113.    Tidjane Thiam became CEO of Credit Suisse in July 2015. He came from an insurance background, having previously been CEO of Prudential Insurance in the United Kingdom.

114.    He was an outsider in the world of international banking, which provided

advantages initially, but also contributed to his ouster five years later.[59]

115.    When Thiam arrived at Credit Suisse, he initiated a strategic review with the intention of refocusing on banking for the world's wealthy and away from riskier securities activities. "'We want to rebalance towards private banking and wealth management . . . as opposed to the investment bank,'" Thiam said in a July 2015 CNBC interview.

116.    During the strategic review, Thiam correctly concluded that the IB Division had been disproportionately elevated during Dougan's tenure, and that the culture and lax risk management that Dougan and his lieutenants had brought with them from their CSFB backgrounds and spread throughout the enterprise, was toxic.

117.    He correctly concluded that this culture and lax risk management regime had been largely to blame for the tax evasion scandal that had just cost Credit Suisse $2.6 billion in fines and a corporate criminal conviction; the RMBS disaster that ultimately would cost Credit Suisse over $9 billion; and for many, if not most, of the other breaches of trust, large and small, that Credit Suisse experienced over the Dougan years, and was still working through.

118.    In October 2015, Thiam announced a restructuring of the enterprise designed to shrink investment banking and cut costs. The IB Division was split in two divisions (IB and Global Markets), and the new Asia Pacific Division took over most investment banking functions in that region. These were not small changes. As described in a lengthy *Euromoney* article, the restructuring:

> began with shock and awe as Thiam recast a bank that had come to be dominated by its markets trading businesses into one that would be dominated by its private banking and wealth management operations instead.

---

[59]    *Tidjane Thiam signals strategy shift at Credit Suisse as profits soar*, The Guardian (July 23, 2015).

Roles were reversed. The super smart traders would no longer be the masters of Credit Suisse. Rather, those that kept their jobs would now mainly serve the private bank that many traders had looked down on as the sleepier side of the business.[60]

119.    The restructuring, moreover, called for a reallocation of capital away from IB and its risky trading culture. Indeed, Thiam publicly and privately called for a ***"cultural change."*** Moreover, in an opinion piece he authored in 2023, just after the Bank's demise, Thiam returned to these themes:

> A big part of my job as chief executive — helped by a dedicated team — was ***setting a new course towards wealth management and away from investment banking*** to fully realise the potential of the franchise.
>
> Risk was always a priority for me. ***It was clear that the bank's risk systems needed a major investment and that this would be a large, multiyear undertaking.*** I often described this as a 10-year job, which was clearly not complete by the time I left. A few days into the role, one of my first decisions was to approve $150mn of new investment in risk management systems. We also increased compliance staff by more than 40 per cent, even when we were conducting a major cost-cutting programme across the bank.
>
> ***It was clear that until risk and compliance systems were materially improved, behaviour and culture would be more important than ever.***[61] (Emphasis added).

120.    Thiam was forced during his tenure to deal with a number of what he called "legacy issues," *i.e.*, issues that he had inherited from the Dougan years. Some of these issues (such as the RMBS disaster) were known, but unresolved when Thiam took over. Others continued to surface after he arrived.

121.    One of the unknown legacy issues involved a huge number of illiquid positions, primarily involving Collateralized Loan Obligations and distressed credit, in the Global Markets Division headed by Defendant O'Hara, a New Yorker who previously had been a co-head of the

---

[60]    *See supra*, n.18.

[61]    Tidjane Thiam, *Credit Suisse's fate casts a shadow over the European banking sector*, Financial Times (Mar. 23, 2023).

IB Division and was a CSFB alumnus.

122.    Thiam publicly complained that he only learned about these positions, most of which originated from New York trading desks, in early 2016. The aggregate value of these positions had to be written down by $1 billion in the first fiscal quarter of 2016. This fiasco was largely the result of the bonus-driven culture in the New York trading operation; traders took larger and riskier positions in an effort to achieve large, short-term results that would be reflected in their bonuses and pay packages, adding to the Bank's risk in order to enhance their own personal bottom lines.

123.    Aside from legacy issues, during his tenure Thiam managed largely to avoid the huge headline-grabbing disasters that Credit Suisse experienced during or as a result of the Dougan Era.

124.    But Thiam was forced out of the Bank in the wake of a spying incident involving two of his most senior executives.

125.    Thiam made two very significant miscalculations that led to huge blow-ups after he left the Bank.

126.    *First*, Thiam and his executive team made critical changes that weakened the risk management and compliance functions as part of their aggressive cost-cutting strategy. They installed inexperienced leaders who had neither the background nor the temperament to push back on aggressive traders seeking to push the limits. They downsized the risk management and compliance operations. And they replaced experienced risk managers with less experienced and capable personnel. These changes left Credit Suisse vulnerable to many serious problems, including but not limited to, the Archegos and Greensill blow-ups that took place in 2021, months after Thiam's departure, but for which he bears responsibility. In November 2017, for example,

the risk monitoring unit within Credit Suisse's prime brokerage business asked Archegos to "add $100 million in additional short positions" because Archegos's portfolio had exceeded a risk limit. Archegos refused. Instead of adhering to policy, Credit Suisse's risk monitoring unit "agreed to waive the limit breach" even though "the breach persisted through the end of 2017. *See* Paul Weiss Report at 65-66. In 2019, moreover, Credit Suisse under Thiam allowed Archegos's "positions" to "become even more concentrated since 2018"—despite having notice of persistent and significant internal control "weaknesses" at Archegos, including "poor risk management practices and procedures." *Id*. at 73.

127.    *Second*, Thiam's decision to cut the capital available to the IB traders carried with it an unintended consequence. The natural effect of the decision to reduce funding for trading would have been to reduce traders' pay and bonuses. But, in part because sufficient controls were not in place to tame the avarice of Credit Suisse traders, they simply ramped up the risk to maintain their lavish paychecks.

128.    The combination of hollowing out the risk management and compliance functions and the increased risks in the IB and Global Markets Divisions (both led by New Yorkers) led not only to the Archegos and Greensill disasters, discussed below, but also to the widening impression that Credit Suisse was untrustworthy and out of control.

129.    While Thiam correctly understood that many of Credit Suisse's most pressing problems stemmed from the toxic culture and lax risk management he inherited, he was unable to fundamentally change the culture, fix the risk management and compliance deficiencies (which he actually worsened), or steer Credit Suisse away from the existential dangers they posed.

D.    **Thomas Gottstein Promised a "New Credit Suisse" But Was "Jettisoned . . . After a String of Seismic Scandals."**

130.    Defendant Thomas Gottstein, who had been head of Credit Suisse's Swiss Universal Bank Division under CEO Thiam, was appointed to replace Thiam in February 2020.

131.    Almost immediately Gottstein was confronted with legacy challenges. In March 2020, Malachite Capital Management ("Malachite") defaulted, causing Credit Suisse to suffer a $214 million loss. The Malachite failure demonstrated, yet again, that Credit Suisse's risk management system and controls were fatally flawed.

132.    As Swissinfo.ch reported:

"Those losses arose from lack of discipline," the former executive said. Just as with Archegos, senior managers at Credit Suisse got stuck in large positions negotiating on price while their peers aggressively sold out.

"There was systematic insensitivity at all levels," said a second person. "If you're the head of risk and you let a $60m loss go by, then a $200m loss, and you don't

ask what the hell is happening here, what are you doing?"[62]

133.    One of the fatal failures was Credit Suisse's IB risk controls, which ignored the fact that Malachite had accrued losses far in excess of its risk limits, exacerbated by the fact that Malachite was overleveraged on risky bets.

134.    Credit Suisse ordered an internal audit of the Malachite loss. The internal audit concluded that Credit Suisse failed to fund and furnish reliable risk control systems and technologies properly resulted in a critical flaw.

135.    In July 2020, Gottstein announced *yet another restructuring*, essentially reversing Thiam's 2015 restructuring by combining investment banking, global markets, and the IB

---

[62]    Stephen Morris, Tabby Kinder, Owen Walker & Robert Smith, *How Credit Suisse rolled the dice on risk management – and lost,* Swiss Info (Apr. 20, 2021), https://www.swissinfo.ch/eng/business/how-credit-suisse-rolled-the-dice-on-risk-management---and-lost/46548906

functions of the Asia Pacific Division into a larger, more powerful global IB. Defendant Brian Chin became head of the IB Division in August 2020.

136.    The restructuring also combined the Chief Risk Officer and Chief Compliance Officer functions into one. Defendant Lara Warner became Chief Risk and Compliance Officer in August 2020.

137.    The restructuring—which Gottstein touted as creating "a new Credit Suisse"—and the appointment of Chin and Warner, proved disastrous. Chin and Warner were both fired in less than a year, following the Greensill and Archegos disasters described below.

**Greensill Meltdown**

138.    In March 2021, Greensill Capital (UK) Ltd. ("Greensill"), a huge client of Credit Suisse's IB and asset management units, became insolvent.

139.    Greensill was a global supply chain lender. Credit Suisse helped finance Greensill by sponsoring funds in which many of Credit Suisse's most important clients invested billions of dollars. With Greensill's meltdown, Credit Suisse was forced to suspend $10 billion of funds linked to Greensill, placing its own client's investments in jeopardy. This put Credit Suisse at odds with some of its most important clients and customers and set off legal and regulatory battles. Ultimately Credit Suisse may lose $2 billion or more.

140.    In addition to the funds, Greensill and its founder, Les Greensill, had significant relationships with, and loans outstanding to, other parts of the Bank. Credit Suisse had warnings but ignored them.

141.    A February 27, 2023, *Financial Times* story entitled "Credit Suisse Breached Supervisory Law Over $10bn Greensill Funds" stated:

> The Swiss financial regulator [Finma] has concluded its two-year investigation into Credit Suisse's failings over the collapse of specialist finance

firm Greensill Capital, finding there had been a "serious breach of Swiss supervisory law."

The implosion of Greensill in March 2021 caused Credit Suisse to suspend and close $10bn worth of funds that had lent money via the supply-chain finance business, trapping the savings of 1,000 of the Swiss bank's most prized clients.

\*      \*      \*

In a statement on Tuesday, Finma, the Swiss regulator, said that Credit Suisse had failed to "adequately identify, limit and monitor risks in the context of the business relationship with Lex Greensill over a period of years." As a result, "Finma thus concludes that there has been a serious breach of Swiss supervisory law," it added.

\*      \*      \*

"Finma also found serious deficiencies in the bank's organisational structures during the period under investigation. Furthermore, it did not sufficiently fulfil its supervisory duties as an asset manager," the regulator added.[63]

142.    Defendant Varvel—a New Yorker who formerly headed the IB Division and had been a Dougan protégé—was the head of the asset management unit in which the Greensill supply chain funds were housed. Because of his responsibility for the debacle, he was ousted from that post on March 18, 2021, although he was permitted to continue as CEO of Credit Suisse Holdings (U.S.) and chairman of the IB.

143.    Defendant Warner was also implicated in the Greensill debacle along with other "senior Credit Suisse executives." According to the *Financial Times*:

Senior Credit Suisse executives overruled risk managers to approve a $160m loan to Greensill Capital, which the collapsing finance group now has "no conceivable way" to repay, according to people familiar with the matter.

Several people with direct knowledge of the loan said that it was initially rejected by London-based risk managers in the investment bank.

That decision was then overruled by senior executives at Credit Suisse, which had developed a lucrative multi-layered relationship with the financing firm

---

[63] Owen Walker & Robert Smith, *Credit Suisse breached supervisory law over $10bn Greensill funds*, Financial Times (Feb. 27, 2023).

and its Australian founder, Lex Greensill. Eventually Lara Warner, the bank's chief risk and compliance officer, signed off on the loan in October, the people added.[64]

**Archegos Scandal**

144.    The Greensill debacle was closely followed by the blow-up of Archegos Capital Management, which resulted in a $5.5 billion loss for Credit Suisse. In late March 2021, Credit Suisse disclosed that it faced "'highly significant and material'" losses in connection with Archegos, a New York-based "family office" that managed the fortune made by former hedge fund manager Bill Hwang.[65] Archegos made huge leveraged bets on a handful of publicly traded stocks. Credit Suisse was one of its primary lenders. But, here again, the investment bankers piled more risk onto the Bank's books, and the risk management group—and senior management— utterly failed to understand the risk or to manage it.

145.    The head of the IB Division, Defendant Chin, and the Chief Risk and Compliance Officer, Defendant Warner, were both fired in the wake of the blow-up.

**The Paul Weiss Report Confirms Systemic Failures and a Dangerous Culture.**

146.    Credit Suisse commissioned New York law firm, Paul Weiss, to conduct an investigation and create a report detailing what lead to the Archegos disaster. Paul Weiss included in its report a section entitled, "CS Should Instill a Culture of Responsibility, Accountability, and Respect for Controls."

147.    The Paul Weiss Report determined that management failures led to the disaster, especially in the New York IB Division:

> Our key observations revolve around a central point: ***no one at CS—not the traders, not the in-business risk managers, not the senior business executives, not***

---

[64]    Stephen Morris, Robert Smith, Arash Massoudi & Owen Walker, *Credit Suisse executives 'overruled' risk managers on $160m loan to Greensill*, Financial Times (Mar. 11, 2021).

[65]    Owen Walker & Stephen Morris, *Credit Suisse lurches from one risk management crisis to the next*, Financial Times (Mar. 31, 2021).

*the credit risk analysts, and not the senior risk officers—appeared to fully appreciate the serious risks that Archegos's portfolio posed to CS*. These risks were not hidden. They were in plain sight from at least September 2020, when CPOC first met and CS senior leaders discussed Archegos's concentrated, long-biased, volatile equity swap positions. Yet no one at the bank acted swiftly and decisively to try to mitigate the risks posed by Archegos. And when CS finally took steps to mitigate the risks, the actions it took were ineffective, too little, and too late. Archegos defaulted on March 25, 2021.

These facts lead to a fundamental and inexorable conclusion: The Prime Services business was mismanaged. This was due in part to a lack of competence (including a failure to appreciate obvious and severe risks) as well as *a culture in which profits were prioritized over sound risk management and respect for controls*. In recent years, CS had cut costs, resulting in significant turnover in the business and a less experienced workforce. Additionally, managers wore multiple "hats," lacked clear roles and responsibilities, and failed to exercise effective oversight. The result was a business that allowed Archegos to take outsized risks without protecting CS from outsized losses.

\*     \*     \*

In addition to questions regarding the competence of CS business and Risk employees who failed to appreciate the significance of the escalating Archegos risks, there were *significant deficiencies in CS's overall risk culture and the failure to prioritize risk management*. This was evident not only as a result of the business's and Risk's failures to escalate Archegos despite numerous red flags, but also by the repeated accommodations that CS made for Archegos, including tolerating persistent limit breaches, as well as CS's lack of investment in personnel and systems.

Paul Weiss Report at 129, 144.

148.    The stated purpose of the Paul Weiss investigation was not limited narrowly to the Archegos default, but more broadly to examine the issues with culture, personnel, and business processes that left Credit Suisse exposed and led to the blow-up and huge losses. The Report condemns senior management—including members of the Executive Board—for violating their duties not only in connection with the Archegos matter, but also for violating their obligations to "prioritize risk management" and to create and enforce, across the enterprise, "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."

**Credit Suisse Senior Management Admits They Failed to Manage Risk in the Investment Bank's Prime Services Businesses.**

149.    The formal response of Credit Suisse senior management to the Paul Weiss Report

was published on July 29, 2021, stating that:

> We acknowledge the findings of the report based on the independent external investigation into Archegos Capital Management (Archegos) and would like to reiterate that our Board of Directors and Executive Board fully share the concerns raised by Paul, Weiss, Rifkind, Wharton & Garrison LLP (hereafter "Paul, Weiss Report").
>
> *        *        *
>
> As previously outlined, the recent events have triggered a detailed review of the bank's risk governance with a particular focus on de-risking and improving limit monitoring and control processes, and strengthening risk oversight. . . . [I]mproving risk culture and embedding risk management into every decision of the bank is an integral part of our strategy and will require ongoing effort. . . .[66]

150.    Credit Suisse's 2021 Annual Report contains the following admissions:

> For example, in respect of the Archegos matter, the independent report found, among other things, a failure to effectively manage risk in the Investment Banks's prime services business by both the first and second lines of defense as well as a lack of risk escalation.

151.    In December 2021, the Bank of England issued a letter regarding Credit Suisse's

failures that led to the Archegos disaster, stating:

> Our observations include weaknesses in the holistic management of risk across business units; narrow focus of onboarding arrangements and inadequate re-assessment of client relationships thereafter; ineffective and inconsistent margining approaches; and an absence of comprehensive limit frameworks.
>
> Many of the deficiencies set out in this letter are not new and have been observed before. In particular it is highly concerning that lessons from the Global Financial Crisis have not been learned sufficiently and that necessary changes to business and risk management practices have not been embedded in firms' operations. A number of the shortcomings are symptoms of a broader root cause. Their origins often stem from *a risk culture in which frontline business executives fail to take accountability for ownership of risk in their organisation; where the*

---

[66]    *Credit Suisse response to the Paul Weiss report*, Credit Suisse (July 29. 2021), https://www.credit-suisse.com/about-us/en/reports-research/archegos-info-kit.html.

*independent risk function lacks standing; and where senior management incentives do not promote safe, sound, and sustainable outcomes for the firm*.[67] (Emphasis added).

152.    Credit Suisse's 2022 Annual Report contains the following admissions:

On July 29, 2021, we published the report based on the independent external investigation into Archegos, which found, among other things, a failure to effectively manage risk in the Investment Bank's prime services business by both the first and second lines of defense as well as a lack of risk escalation.

153.    At the 2022 annual meeting, Credit Suisse Chairman Axel Lehmann stated:

It has become clear that the challenges of the past were not solely attributable to isolated poor decisions or to individual decision makers. . . . Within the organisation as a whole, we have failed too often to anticipate material risks in good time in order to counter them proactively and to prevent them" . . . [including] over a $5.5bn trading loss the bank suffered on the collapse of family office Archegos Capital last spring, the biggest in its history.

154.    On May 10, 2022, the *Financial Times* reported:

The Archegos loss came just weeks after Credit Suisse was forced to close a group of funds linked to the specialist finance firm Greensill Capital, trapping $10bn of client money. . . . The twin crises have been the most prominent in a string of scandals that have plagued the bank going back to the global financial crisis of 2008.

A common thread running through the bank's failings has been a risk department that was all too often overruled by commercially minded executives who were chasing higher returns from riskier deals, according to several current and former employees.

"We had historically weak compliance combined with high risk-taking businesses," says a former executive who worked in the bank's risk department. "The structure also made it very difficult to see total global risk—it was like playing hide and seek."[68]

---

[67]    Letter from Nathanaël Benjamin, David Bailey & Sarah Pritchard of the Bank of England to Chief Executive Officer (Dec. 10, 2021), https://www.fca.org.uk/publication/correspondence/dear-ceo-supervisory-review-global-equity-finance-businesses.pdf.

[68]    Owen Walker, *Credit Suisse Admits Lax Approach Led to Scandals*, Financial Times (May 10, 2022).

155.    The toxic Credit Suisse culture did not begin during Gottstein's reign as CEO. But, critically, despite his promise of "a New Credit Suisse," Gottstein was not able to bring an end to or materially change this rotten culture. Gottstein was ousted in July 2022 for his inability to instill and enforce a disciplined risk management system and a culture of responsibility, accountability, and respect for controls, as noted in the Paul Weiss Report.

## E.    António Horta-Osório's Failed Cultural Shift

156.    In December 2020, not long after Thiam's departure as CEO, and facing continuing headwinds, Credit Suisse reached agreement with celebrated Portuguese banker António Horta-Osório to become its new Chairman.

157.    Horta-Osório had led the revival of UK-based Lloyd's Bank as its CEO. He was recruited to help re-establish Credit Suisse's business and reputation. The plan was to install him as Chairman following a shareholder vote at the Annual General Meeting scheduled for the end of April 2021.

158.    The series of disasters between December 2020 and late April 2021, including but not limited to, Greensill and Archegos, and the management and other changes made in their wake, brought Horta-Osório's challenges into bright relief. He stepped into a Credit Suisse reeling from the series of scandals and missteps and in need of more than a cosmetic makeover.

159.    As reflected in the Paul Weiss Report and elsewhere, ***the main issue was culture— the lax risk culture, the ethically challenged culture Dougan and his CSFB gang had brought into Credit Suisse was again proving difficult to eradicate***.

160.    The headline of a July 2021 *Fortune* article cut right to the main issue:[69]

# FORTUNE

FINANCE · CREDIT SUISSE GROUP

## Credit Suisse report into $5.5 billion Archegos loss shows bank has a massive culture problem

BY CHRISTIAAN HETZNER
July 29, 2021 at 5:25 AM POT

161.    Soon after arriving, Horta-Osório announced a strategic review. In November 2021, he announced yet another restructuring. But this time, the "overhaul" was explicitly "***more cultural than structural***," because the cultural issues had become so glaring. Thus, a *Wall Street Journal* article entitled, "*Credit Suisse Plans a Cultural Revolution*," noted that Horta-Osório's "primary objective is to strengthen the bank's risk culture."[70]

162.    Indeed, Horta-Osório told reporters in November 2021 that his new strategy was designed to "'***rebuild a culture of trust***'" while acknowledging that there was "'no quick fix'" and it would be a "'continuous effort.'"[71]

163.    Unfortunately, Horta-Osório himself created a serious breach of trust through personal use of the corporate jet and by violating COVID restrictions and protocols. As a result, Horta-Osório was ousted from his position as Chairman in January 2022, only nine months after he started.

164.    His effort to "'rebuild a culture of trust'" at Credit Suisse flamed out.

---

[69]    Christian Hetzner, *Credit Suisse report into $5.5 billion Archegos loss shows banks has a massive culture problem*, Fortune (July 29, 2021), https://fortune.com/2021/07/29/credit-suisse-report-archegos-loss-bank-massive-culture-problem/.

[70]    Rochelle Toplensky, *Credit Suisse Plans a Cultural Revolution*, Wall St. J. (Nov. 4, 2021).

[71]    *See supra*, n.32.

**F.    Axel Lehmann and Ulrich Körner Were Unable to "'Stem the Loss of Trust That Had Accumulated Over the Years.'"**

165.    In January 2022, Alex Lehmann replaced Horta-Osório as Chairman and soon thereafter, in July 2022, Körner replaced Gottstein as CEO.

166.    By the summer of 2022, fixing the Bank's admittedly broken risk culture was front and center for senior management. Indeed, the opening presentation of the Investor Deep Dive in late June 2022 was entitled "Elevating Our Risk Culture and Capability." This presentation, by David Wildermuth (the new Chief Risk Officer brought in from Goldman Sachs), highlighted "recent developments" as follows:

   ☐ *Clear and dedicated focus on risk culture at the heart of the Group Strategy announced in November 2021*

   ☐ *Several immediate enhancements made following Archegos, e.g. risk elements on senior performance scorecards, "Everyone is a risk manager" communications*

   ☐ *A risk culture framework has been developed focusing on desired behaviors and focus foundation elements*

   ☐ *To track progress, an internal risk culture dashboard has been developed with specific metrics to measure and drive change*

   ☐ *Progress will be driven by a Risk Culture Activities plan with activities along various framework dimensions*

167.    But by this point the Board and senior management were desperately attempting to play catch-up.  It proved too little/too late.

168.    Lehmann and Körner instituted yet another restructuring plan. A Credit Suisse press release dated October 27, 2022, began with this:

   Credit Suisse Group AG (Credit Suisse) today announces a series of decisive actions to create a simpler, more focused and more stable bank built around client needs. The announcement follows a strategic review conducted by the Board of Directors and Executive Board, resulting in a radical restructuring of the Investment Bank, an accelerated cost transformation, and strengthened and

reallocated capital, all of which are designed to create a new Credit Suisse.[72]

169.    The press release contained a lengthy quote from Lehmann:

"Over 166 years, Credit Suisse has built a powerful and respected franchise but we recognize that in recent years we have become unfocused. For a number of months, the Board of Directors along with the Executive Board has been assessing our future direction and, in doing so, we believe we have left no stone unturned. Today we are announcing the result of that process—a radical strategy and a clear execution plan to create a stronger, more resilient and more efficient bank with a firm foundation, focused on our clients and their needs. At the same time, *we will remain absolutely focused on driving our cultural transformation*, while working on further improving our risk management and control processes across the entire bank. I am convinced that this is the blueprint for success, *helping rebuild trust* and pride in the new Credit Suisse while realizing value and creating sustainable returns for our shareholders." (Emphasis added).

170.    The release also quoted Körner as saying:

"This is a historic moment for Credit Suisse. We are *radically restructuring the Investment Bank* to help create a new bank that is simpler, more stable and with a more focused business model built around client needs. Our new integrated model, with our Wealth Management franchise, strong Swiss Bank and capabilities in Asset Management at its core, is designed to allow us to deliver a unique and compelling proposition for clients and colleagues while targeting organic growth and capital generation for shareholders. *The new Executive Board is focused on restoring trust through the relentless and accountable delivery of our new strategy, where risk management remains at the very core of everything we do*." (Emphasis added).

171.    Perhaps by this point in late 2022, stakeholders could have been forgiven for wondering if they had not heard similar assurances before. But this restructuring appeared more "radical" than the others, not the least because of the intention to recreate Credit Suisse First Boston as a New York-based investment bank, and to spin it out of Credit Suisse. Credit Suisse recognized the cancer and was trying to excise it.

---

[72]    Press Release, Credit Suisse Group AG, *Credit Suisse unveils new strategy and transformation plan* (Oct. 27, 2022), https://www.credit-suisse.com/media/assets/corporate/docs/about-us/media/media-release/2022/10/strategy-update-press-release-en.pdf.

172.    An article published in November 2022 skeptically asked: "What Magic Can Credit Suisse Leaders Pull out of Their Hats?" This article included:

> Lamenting the desolate state of Credit Suisse is not enough. The situation begs the question of what options the bank on Paradeplatz still has. What can the duo Axel Lehmann and Ulrich Koerner do to put CS back on the road to success?
>
> *            *            *
>
> Neither Koerner nor Lehmann have commented on Credit Suisse culture in recent weeks. ***This raises the question as to how much Swissness there is left in the bank, especially since the Swiss private bank was built on Swiss values.***
>
> Recently, the answer to that question turned out to be negative, as lawyer Monika Roth recently said in an interview with the Neue Zürcher Zeitung. She said ***in the bank's international business, a different set of rules seems to apply, with a culture different from the Swiss unit. In Switzerland, the smallest infractions are punished, but international asset management, as long as it makes money, can get away with more***.[73]  (Emphasis added).

173.    The end, although long in the making, came a few months later, in March 2023. The accumulated "loss of trust" manifested in huge and accelerating outflows because clients and customers were pulling their money out of the Bank. By the end of 2022, customers had withdrawn $154 billion of assets.

174.    During the week of March 13, 2023, Credit Suisse reached its internal liquidity limit at the SNB.

175.    In response, on March 15, 2023, the Swiss government provided $43.5 billion USD in "extraordinary" liquidity assistance.

176.    This assistance did not reassure customers and could not staunch the outflows. As of March 16, 2023, a further $15.6 billion was withdrawn from customer accounts and based on

---

[73]    Claude Baumann, *What Magic Can Credit Suisse Leaders Pull out of Their Hats?*, Finews (Nov. 24, 2022), https://www.finews.asia/finance/38118-credit-suisse-ulrich-koerner-axel-lehmann-cultural-change-executives-francesco-de-ferrari-wealth-management.

the "foreseeable or continuing outflows" the government provided an additional $22.3 billion in "extraordinary liquidity support."

177.    Despite the total of approximately $65.9 billion USD in support, asset outflows worsened at Credit Suisse caused by the erosion of trust. By the end of March 2023, customers had withdrawn an additional $68 billion, bringing the total customer withdrawals since October 2022 up to over 15% of the Bank's total assets.[74]

178.    Credit Suisse's unusual client base was a significant factor behind the huge asset outflows. Credit Suisse had long sought to bank the wealthiest and most sophisticated people and entities in the world. But that cadre was able to move massive amounts of assets very quickly when they perceived that their own assets were at increased risk, or that the stability, discretion, and predictability that attracted them to Credit Suisse in the first place were becoming unsettled. The nature and characteristics of the Bank's client base increased the imperative for sound risk management undergirded by a healthy risk culture and increased the foreseeability of outflows and instability in trust-bases crises.

179.    By the weekend of March 18-19, the Swiss government and FINMA determined they had to act because, as Swiss Minister of Finance Karin Keller-Sutter put it, "'***Credit Suisse would not have survived Monday***'" (*i.e.*, the next trading day).

180.    The government and FINMA concluded they had but a few viable options for Credit Suisse: bankruptcy, resolution, nationalization, or a forced sale. This dire situation was caused by the years of misconduct, malfeasance, and managerial negligence perpetrated by the Defendants in breach of their duties. Despite FINMA taking decisive action, as Chairman Amstad observed,

---

[74]  Hann Ziady, *Depositors pulled $75 billion from Credit Suisse as it veered toward collapse*, CNN Business (Apr. 24, 2023), https://www.cnn.com/2023/04/24/investing/credit-suisse-bank-withdrawals-total/index.html.

"[a]ll these tools are not there to impose a strategy on a bank or to restore the trust of clients. This is the task of management, the boards of directors and ultimately the owners."

181.    FINMA issued a Decree to Credit Suisse on March 19, 2023, ordering the write-down of all outstanding AT1 bonds to zero. FINMA noted that the "Credit Suisse Group is experiencing a crisis of confidence, which has manifested in considerable outflows of client funds" and that "it was necessary for the authorities to take action in order to prevent serious damage to the Swiss and international financial markets." FINMA further observed that the Bank had experienced "substantial liquidity outflows since October 2022" and the customer withdrawals accelerated from March 13 and 14, 2023. FINMA concluded that, as a result of the "major reputational damage," the "deep crisis of confidence," the accelerating customer withdrawals, and the resulting liquidity shortages, Credit Suisse had to zero out the value of all outstanding AT1 bonds to "prevent insolvency" and to "ensure the continued existence of [Credit Suisse]."

182.    Credit Suisse's write-down of the value of all outstanding AT1 bonds was a result of a self-inflicted liquidity and collateral crisis that, in turn, was a product of the broken trust between the Bank and its customers from the years of accumulated scandals resulting from the Defendants' negligence and breaches of duties owed under Swiss law to Plaintiff and the Class. As FINMA Chairwoman Amstad noted, "[s]trategic misjudgments on the part of the bank, the failure of the management or losing the trust of clients and investors are not supervisory offences. . . . Responsibility for action rests with . . . the board of directors."

183.    FINMA's order to write the AT1 bonds down to zero, though the immediate instrumentality by which the AT1 bonds were wiped out, was not the cause of the wipeout or of the holders' losses. The FINMA decree merely confirmed what was already true—the AT1 bonds were going to be wiped out, one way or another, on or about March 19, 2023. Loss of trust was

the cause. Indeed, FINMA's CEO confirmed the inevitability of the destruction of the AT1 bonds:

> Allowing the bankruptcy of troubled lender Credit Suisse would have crippled Switzerland's economy and financial center and likely resulted in deposit runs at other banks, Swiss regulator FINMA said Wednesday.

> The bankruptcy plan, FINMA CEO Urban Angehrn said in a statement, was "de-prioritised early on due to its high tangible and intangible costs." It would have **_erased the holding company Credit Suisse Group, along with the parent bank Credit Suisse AG_** and its branches, while retaining the Credit Suisse (Schewiz) AG entity because of its "systemic importance."

\*     \*     \*

> Among FINMA's other options, the resolution recourse would have downsized Credit Suisse, with the Swiss National Bank supplying liquidity assistance loans backed by a federal default guarantee. **_The bank's equity and AT1 bonds would still have been written down to zero_**, with other bondholders being bailed in.[75] (Emphasis added).

184.    The fact that Defendants' conduct had likely damaged the AT1 bonds, and certainly placed them at significant risk, even before the FINMA decree is also clear from how Credit Suisse executives were scheming behind the scenes as early as January 2023—more than two months prior to the FINMA decree—to insulate themselves and former highly-placed executives from losses they anticipated in connection with the Tier 1 capital instruments, *i.e*., the CCAs and AT1 bonds. Specifically, on January 12, 2023, Credit Suisse informed FINMA that it would no longer count Credit Suisse Employee Contingent Capital Awards ("CCAs") as Regulatory Core Tier 1 Capital. CCAs are equivalent to AT1 Tier 1 Capital with the difference being AT1s are offered to outside creditors, like Plaintiff here, and CCAs were awarded to Credit Suisse executives and board members as bonuses, deferred compensation, or retentions payments. There are an estimated $400 million to $700 million in granted or authorized Tier 1 CCA instruments for executives and

---

[75]    Ruxandra Iordache, *Switzerland faced a full-scale bank run if Credit Suisse went bankrupt, Swiss regulator argues*, CNBC (Apr. 5, 2023), https://www.cnbc.com/2023/04/05/switzerland-faced-a-bank-run-if-credit-suisse-went-bankrupt-swiss-regulator.html.

board members, including for Defendants in this action.

185.    In other words, nearly two months before the collapse of Credit Suisse, Credit Suisse executives knew—based on their insider knowledge of the dire situation of the Bank, the deepening crisis of confidence, and the scale of customer and client withdrawals—that the value of Tier 1 capital component of their own compensation had evaporated or been dramatically diminished.

186.    Unsurprisingly, Credit Suisse executives took decisive and aggressive action to protect their own Tier 1 exposure over those of Plaintiff and the Class. These actions not only reflect the toxic me-first culture of those at the top of Credit Suisse, but they demonstrate that senior executives and Board members were well-aware of the unprecedented customer withdrawals and the threat that represented to the continued existence of the Bank.

187.    This shows that the senior Credit Suisse insiders, who were best placed to understand the existential danger the Bank was in and the likelihood of an AT1 write-down, were attempting to protect their own hundreds of millions of dollars in CCA deferred compensation.

188.    This self-serving January 12, 2023, attempt by Credit Suisse executives to protect their own hundreds of millions of dollars of compensation over the interests of the other AT1 investors is emblematic of the rotten culture in the Bank and it is consistent with years of self-serving actions and practices. According to *Bloomberg's* calculations, "[in] the past dozen years, Credit Suisse put 35 billion francs into its annual bonus pools. . . . The total profits generated in that period: 35 million francs."[76]

---

[76] Marion Halftemeyer, *Credit Suisse Employee Bonuses Tied to AT1 Bonds Also Wiped Out*, Bloomberg (Apr. 27, 2023), https://www.bloomberg.com/news/articles/2023-04-27/credit-suisse-employee-bonuses-tied-to-at1-bonds-also-wiped-out.

189.    Despite this request, on March 19, 2023, FINMA issued a decree instructing Credit Suisse to write all AT1 bonds down to zero. Credit Suisse jumped into action to save the Employee CCA instruments, but not for others, and sent a letter on March 20, 2023, asking FINMA to reconsider its March 19 Decree. Credit Suisse reminded FINMA that it sent the January 12, 2023, e-mail, informing FINMA that it was removing the Employee CCAs from Tier 1 so those instruments could be paid out without FINMA approval.

190.    On March 23, 2023, FINMA issued a sharp rebuke of Credit Suisse's request for special treatment for the Employee CCAs. FINMA denied the March 20, 2023, request for reconsideration and determined that the Employee CCAs are covered by FINMA's March 19, 2023, Decree to write off and cancel AT1 bonds. This decision merely confirmed what the Credit Suisse executives had known months before—that the "loss of trust that had accumulated over the years" had already likely damaged, and threatened to destroy, the value of Tier 1 capital instruments like the AT1 bonds and the CCAs as early as January 2023.

## V.    RELEVANT SWISS STATUTES AND DEFENDANTS' BREACHES THEREOF

191.    Directors and senior managers of Swiss stock companies are governed by Swiss statutory law, and in particular, the Swiss Code of Obligations. The Code sets forth the duties Defendants owed and breached to the AT1 bondholders.

### A.    Relevant Swiss Code of Obligations

192.    The relevant provisions of the Code of Obligations include, but are not limited to:

**Art. 716a**

The board of directors shall have the following non-transferable and inalienable duties:

1. The overall management of the company and issuing the required directives;

*     *     *

3. Organizing the accounting, financial control and financial planning systems as required for management of the company;

4. Appointing and dismissing persons entrusted with managing and representing the company;

5. Overall supervision of the persons entrusted with managing the company, in particular with regard to compliance with the law, articles of association, operational regulations and directives;

**Art. 716**

1. The board of directors may pass resolutions on all matters not reserved to the general meeting by law or the articles of association.

2. The board of directors shall manage the business of the company, un- less responsibility for such management has been delegated.

**Art. 716b**

1. Unless the articles of association provide otherwise, the board of directors may delegate the management of all or part of the company's business in accordance with organisational regulations to individual members or third parties (executive board).

2. In the case of companies whose shares are listed on a stock exchange, the management of the company's business may be delegated to individual members of the board of directors or to other natural persons. The management of the company's assets may be delegated to natural persons or legal entities.

**Art. 717**

1. The members of the board of directors and third parties engaged in managing the company's business must perform their duties with all due diligence and safeguard the interests of the company in good faith.

**Art. 754**

1. The members of the board of directors and all persons engaged in the business management or liquidation of the company are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties.

**Art. 759**

1. Where two or more persons are liable for the losses, each is jointly and severally liable with the others to the extent that the damage is personally attributable to him or her on account of his or her own fault and the circumstances.

59

2. The claimant may bring action against several persons jointly for the total losses and request that the court determine the liability of each individual defendant in the same proceedings.

**B.    Defendants Violated Their Duties to the AT1 Bondholders**

193.    Defendants Urs Rohner and Sir António Horta-Osório (the "Chairman Defendants") had duties encompassing the entire enterprise during the time each was in office. The Chairmanship was a full-time job paying millions of dollars annually. The Chairman Defendants had responsibility for oversight and supervision of those they appointed to manage Credit Suisse's business, including but not limited to members of the Executive Board. They had responsibility for financial controls. They had the responsibility of instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols."

194.    Defendants Rohner and Horta-Osório breached their duties by failing repeatedly in each of these areas, and as more specifically set out herein. Their acts and omissions in breach of their duties render them responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above and for the loss of trust that brought Credit Suisse down and caused the AT1 bonds to be wiped out.

195.    Defendants Brady W. Dougan, Tidjane Thiam, and Thomas Gottstein (the "CEO Defendants") were members of the Credit Suisse Executive Board and had duties encompassing the entire enterprise during the time each was in office. The CEO Defendants had responsibility for managing Credit Suisse as a whole. They had responsibility for financial controls. They had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols." Instead, they materially contributed to Credit Suisse's toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not requiring diligent compliance and risk management. They breached their duties by failing repeatedly in each of these areas, and as more

specifically set out herein. Their acts and omissions in breach of their duties render them responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above and for the loss of trust that brought Credit Suisse down and caused the AT1 bonds to be wiped out.

196.    Defendants Eric Varvel, James L. Amine, Timothy P. O'Hara, David Miller, Brian Chin, Christian Meissner, and Gaël De Boissard (the "Investment Banking Head Defendants") were members of the Credit Suisse Executive Board and had responsibility for managing the IB Division during their time in that position. They had responsibility for financial controls. They had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols." Instead, they materially contributed to the toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not requiring diligent compliance and risk management. They breached their duties by failing repeatedly in each of these areas, and as more specifically set out herein. Their acts and omissions in breach of their duties render them responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above and for the loss of trust that brought Credit Suisse down and caused the AT1 bonds to be wiped out.

197.    Defendant Robert S. Shafir was a member of the Credit Suisse Executive Board and had responsibility for managing the Asset Management Division, and later the Private Banking and Wealth Management Division, when he served as head of those units and as a member of the Executive Board. He had responsibility for financial controls. He was responsible for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols." Instead, he materially contributed to the toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not

requiring diligent compliance and risk management. He breached his duties by failing repeatedly in each of these areas, and as more specifically set out herein. His acts and omissions in breach of his duties render him responsible and legally liable for the misconduct, malfeasance, and managerial negligence described above, and for the loss of trust that brought Credit Suisse down and caused the AT1 bonds to be wiped out.

198.    Defendant Lara J. Warner had enterprise-wide responsibility for compliance, and, subsequently, for compliance and risk management, and she served on the Credit Suisse Executive Board. She had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols." Instead, she materially contributed to the toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not requiring diligent compliance and risk management. She breached her duties by failing repeatedly in each of these areas, and as more specifically set out herein. Her acts and omissions in breach of her duties render her responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above, and for the loss of trust that brought Credit Suisse down and caused the AT1 bonds to be wiped out.

199.    Defendants Richard E. Thornburgh, Andreas Gottschling, Michael Klein, and Noreen Doyle (the "Director Defendants") had duties encompassing the entire enterprise during the time each was in office. They had responsibility for oversight and supervision of those they appointed to manage Credit Suisse's business, including but not limited to, members of the Executive Board. They had responsibility for financial controls. They had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols." That is particularly the case because each was a member of the Risk Committee. They breached their

duties by failing repeatedly in each of these areas, and as more specifically set out herein. Their acts and omissions in breach of their duties render them responsible—and legally liable—for the misconduct, malfeasance, and managerial negligence described above, and for the loss of trust that brought Credit Suisse down and caused the AT1 bonds to be wiped out.

200.    The standard for liability of "members of the board of directors and all persons engaged in the management . . . of the company" is negligence. The claims asserted herein are based on that negligence standard, not on fraud or other intentional conduct. More specifically, the claims asserted herein arise from each Defendants' failures in connection with risk management, and more specifically the bad risk culture they instilled, then failed to fix.

201.    The cumulative weight of these failures resulted in the "loss of trust that had accumulated over the years" leading to the collapse of Credit Suisse.

202.    Because of the nature of AT1 bonds, Plaintiff did not learn of the damage ***in connection specifically with the AT1 bonds*** until March 2023.

## VI.    CLASS ACTION ALLEGATIONS

203.    Plaintiff brings this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

204.    Plaintiff seeks to represent the following class (the "Class"):

**AT1 Bondholder Class**: All holders who held Credit Suisse AT1 bonds between January 12, 2023, and March 19, 2023, inclusive.

205.    The AT1 bonds within the AT1 bondholder class are:

| Issuer Name | Issue Date | Issued Amount | ISIN | Coupon | Series | Maturity Type | Currency |
|---|---|---|---|---|---|---|---|
| Credit Suisse Group AG | 12/11/2013 | $2,250,000,000 | XS0989394589 | 7.500 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 12/11/2013 | $2,250,000,000 | US22546DAB29 | 7.500 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/18/2014 | $2,500,000,000 | XS1076957700 | 6.250 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/18/2014 | $2,500,000,000 | US225436AA21 | 6.250 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 3/22/2017 | SFr 200,000,000 | CH0360172719 | 3.875 | | Perpetual Callable | CHF |
| Credit Suisse Group AG | 7/16/2018 | $2,000,000,000 | USH3698DBW32 | 7.500 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 7/16/2018 | $2,000,000,000 | US225401AJ72 | 7.500 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 9/4/2018 | SFr 300,000,000 | CH0428194226 | 3.500 | | Perpetual Callable | CHF |
| Credit Suisse Group AG | 9/12/2018 | $1,500,000,000 | USH3698DBZ62 | 7.250 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 9/12/2018 | $1,500,000,000 | US225401AK46 | 7.250 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/6/2019 | S$ 750,000,000 | CH0482172324 | 5.625 | | Perpetual Callable | SGD |
| Credit Suisse Group AG | 8/21/2019 | $1,750,000,000 | USH3698DCP71 | 6.375 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 8/21/2019 | $1,750,000,000 | US225401AL29 | 6.375 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 9/11/2019 | SFr 525,000,000 | CH0494734384 | 3.000 | | Perpetual Callable | CHF |
| Credit Suisse Group AG | 1/24/2020 | $1,000,000,000 | USH3698DCV40 | 5.100 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 1/24/2020 | $1,000,000,000 | US225401AN84 | 5.100 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 8/11/2020 | $1,500,000,000 | USH3698DDA93 | 5.250 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 8/11/2020 | $1,500,000,000 | US225401AR98 | 5.250 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 12/9/2020 | $1,500,000,000 | USH3698DDD33 | 4.500 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 12/9/2020 | $1,500,000,000 | US225401AS71 | 4.500 | 144A | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/23/2022 | $1,650,000,000 | USH3698DDQ46 | 9.750 | REGS | Perpetual Callable | USD |
| Credit Suisse Group AG | 6/23/2022 | $1,650,000,000 | US225401AX66 | 9.750 | 144A | Perpetual Callable | USD |

206.    A very large proportion of class members are citizens of the United States. The best available information indicates that approximately 44% of the par value of AT1 bonds was held by U.S. persons or institutions on December 31, 2022, with more than 19% in the New York City metro area alone.[77] The same data show that less than 5.5% was held by Swiss persons or institutions. Class members include citizens of, at least, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, New York, North Carolina, Pennsylvania, Texas, Utah, Vermont, Virginia, Washington, Washington, D.C., and Wisconsin.

207.    Excluded from the Class are Defendants; the judicial officers, and their immediate family members; all Credit Suisse Employee CCA holders and Court staff assigned to this case.

---

[77] These numbers are derived from information available to Bloomberg LP subscribers. Bloomberg LP sources data from various different sources from fund manager parent company aggregated holdings, aggregate holdings of portfolios belonging to the same fund families and Schedule D of the National Association of Insurance Commissioners ("NAIC"). The data set is incomplete but is believed to be the best data set available.

208.    Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

209.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

210.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believe that there are thousands of Class members, the precise number of Class members is presently unknown to Plaintiff but may be ascertained from books and records accessible to Defendants. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

211.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.    whether Defendants engaged in the conduct alleged herein;

    b.    whether Defendants' alleged conduct violates applicable law;

    c.    Whether Defendants intentionally or negligently breached their duties to Plaintiff and the other Class members;

    d.    whether Defendants' conduct caused Plaintiff and the other Class members to suffer compensable losses;

    e.    whether Defendants' conduct alleged herein violated Article 716a of the Swiss Code of Obligations;

f.      whether Defendants' conduct alleged herein violated Article 716b of the Swiss Code of Obligations;

g.      whether Defendants' conduct alleged herein violated Article 717 of the Swiss Code of Obligations;

h.      whether Defendants' conduct alleged herein violated Article 754 of the Swiss Code of Obligations;

i.      whether Defendants' conduct alleged herein violated Article 759 of the Swiss Code of Obligations;

j.      whether Plaintiff and the other Class members are entitled to actual, statutory, or other forms of damages, or any other form of monetary relief;

k.      the amount and nature of relief to be awarded to Plaintiff and the other Class members; and

l.      whether Plaintiff and the other Class members are entitled to equitable relief.

212.    **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the other Class members' claims, because Plaintiff and each of the other Class members were holders of Credit Suisse AT1 bonds between January 12, 2023, and March 18, 2023, and have been similarly affected by Defendants' conduct. Plaintiff and each of the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

213.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**. Plaintiff is an adequate Class representative because his interests do not conflict with the interests

of the other members of the Class that he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

214.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**. Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

215.    **Superiority – Federal Rule of Civil Procedure 23(b)(3)**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct. Even if the Class members could afford litigation the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Moreover, class actions like this one are not permitted in any Swiss forum and Class members would not be able to prosecute separate individual actions in Switzerland, given the size and complexity of the case, Swiss court filing fees, and cost-bonding requirements for non-Swiss residents.

## VII.    CLAIM ALLEGED

### NEGLIGENT BREACH OF DUTIES
### Violation of Swiss Code of Obligations Articles 716a, 716/716b, 717, 754, and 759
### (Against All Defendants)

216.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

217.    Defendants breached their statutory duties owed to Credit Suisse's AT1 bondholders, including Plaintiff and each of the other Class members, under Swiss law.

218.    Defendants' breaches of their statutory duties caused direct damage to Credit Suisse's AT1 bondholders, including Plaintiff and each of the other Class members. Defendants also caused a separate loss directly to Credit Suisse.

219.    When creditors like the AT1 bondholders have suffered a "direct" loss, they may plead a direct action against directors and officers of a Swiss company as long as they can identify a breach of a "protective norm."

220.    As relevant here, Art. 716a CO, Art. 716/716b CO, and Art. 717 CO contain norms with "double protective effect," on which creditors such as Plaintiff may rely and base their direct action under Art. 754 CO.

221.    Credit Suisse AT1 bondholders, including Plaintiff and each of the other Class members, as creditors, have suffered direct loss or damage due to Defendants' negligent breach of their duties to perform their duties.

222.    Defendants' actions and/or failures to act were a substantial factor in causing the damages and losses to Plaintiff and each of the other Class members, as alleged above. Defendants each had duties to act and, as alleged above, failed to carry out their duties, causing direct damage to Plaintiff and the Class.

223.    Defendants have sufficient assets in the United States that can be reached to satisfy all judgments. Any insurance coverage of these Defendants or its officers or directors can be reached in the United States.

224.    Defendants are jointly and severally liable to each Class Member for damages in an amount to be proven at trial.

### VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf the other Class members respectfully requests that the Court enter judgment in his/their favor and against Defendants, as follows:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

B.    Awarding actual, direct, and compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding restitution and disgorgement of revenues, if warranted;

D.    Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices, as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all monies required;

E.    Awarding Plaintiff's Counsel reasonable fees and expenses in addition to and on top of damages;

F.    Awarding pre-judgment and post-judgment interest as provided by law; and

G.    Providing such further relief as may be just and proper.

## IX.    JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 22, 2023

*s/  Greg G. Gutzler*

**DiCELLO LEVITT LLP**
James D. Baskin (*pro hac vice* forthcoming)
Greg G. Gutzler
Li Yu
485 Lexington Avenue, Suite 1001
New York, New York 10017
Tel.: 646-933-1000
ggutzler@dicellolevitt.com
lyu@dicellolevitt.com
jbaskin@dicellolevitt.com

**DiCELLO LEVITT LLP**
Patrick W. Daniels (*pro hac vice* forthcoming)
Henry R. Rosen (*pro hac vice* forthcoming)
Roxana Pierce (*pro hac vice* forthcoming)
Caroline Robert (*pro hac vice* forthcoming)
4747 Executive Drive, Second Floor
San Diego, California 92121
Tel.: 619-923-3939
pwdaniels@dicellolevitt.com
hrosen@dicellolevitt.com
rpierce@dicellolevitt.com
cmrobert@dicellolevitt.com

**DiCELLO LEVITT LLP**
Adam J. Levitt
Mark S. Hamill (*pro hac vice* forthcoming)
Adam Prom (*pro hac vice* forthcoming)
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: 312-214-7900
alevitt@dicellolevitt.com
mhamill@dicellolevitt.com
aprom@dicellolevitt.com

***Counsel for Plaintiff and the Proposed Class***