UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————x

PETER SCHUR, Individually and on Behalf of
Other Credit Suisse Group AG AT1
Bondholders,
                          Plaintiff,                                    23 Civ. 10944 (CM)

    v.

BRADY W. DOUGAN, et al.,

                          Defendants.

————————————————————x                      USDC SDNY
                                              DOCUMENT
                                              ELECTRONICALLY FILED
                                              DOC #:_____
                                              DATE FILED: 9/19/24

HOHIMER WEALTH MANAGEMENT
LLC, Individually and on Behalf of Other
Credit Suisse Group AG AT1 Bondholders,
                          Plaintiff,                                    23 Civ. 11138 (CM)

    v.

BRADY W. DOUGAN, et al.,

                          Defendants.

————————————————————x

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

McMahon, J.:

        Plaintiffs Hohimer Wealth Management LLC ("Hohimer") and Peter Schur ("Schur,"

together, "Plaintiffs"), on behalf of themselves and all other similarly situated persons or entities

(the "Class") who were holders of Credit Suisse U.S. Dollar denominated "Additional Tier One"

("AT1") bonds between January 12, 2023 and March 19, 2023, inclusive (the "Class Period"),

cleared, recorded, or held by or through The Depository Trust Company or the U.S. depository for

Clearstream Banking S.A. ("Clearstream") or the Euroclear System ("Euroclear"), bring putative class actions against Credit Suisse Group AG ("Credit Suisse" or the "Bank" or the "Company") executives and board members (the "Defendants"). According to Plaintiffs, the Defendants negligently breached the statutory duties they owed to Credit Suisse's AT1 bondholders under Swiss law. Defendants have moved to dismiss these actions on several grounds, including on the basis of *forum non conveniens*.

Earlier this year, I relied on the doctrine of *forum non conveniens* to dismiss similar Swiss law claims involving overlapping allegations and individual defendants. *See Star Colbert v. Dougan*, No. 23 Civ. 7297, 2024 WL 1197863 (S.D.N.Y. Mar. 20, 2024); *Stevenson v. Thornburgh*, No. 23 Civ. 4458, 2024 WL 645187 (S.D.N.Y. Feb. 14, 2024). For many of the same reasons, Defendants' motions to dismiss are granted on that ground – without prejudice, so that Plaintiffs can sue in Switzerland – and the Complaints are dismissed as against all Defendants.

## BACKGROUND

### I.    Parties

#### a.  Plaintiffs

Plaintiff Hohimer Wealth Management LLC, a Washington Limited Liability company with its principal place of business in Washington, held Credit Suisse AT1 bonds during the Class Period. Hohimer Compl. ¶ 40. Plaintiff Peter Schur, a U.S. citizen currently residing in Florida, purchased Credit Suisse AT1 bonds in 2017 and held the bonds during the Class Period. Schur Compl. ¶ 40.[1]

---

[1]    As the *Schur* and *Hohimer* Complaints are identical except for the identification of the Plaintiffs, citations herein to both Complaints will be singularly identified as "Compl." *See* Opp. Memo, at 1 n.1.

Plaintiffs seek to represent a class consisting of "[a]ll holders of a beneficial interest in Credit Suisse U.S. Dollar denominated AT1 notes or Global Certificates between January 12, 2023, and March 19, 2023, inclusive, cleared, settled, recorded or held by or through The Depository Trust Company ('DTC') in New York," Compl. ¶ 184, excluding the "Defendants; the judicial officers, and their immediate family members; all Credit Suisse Employee CCA holders and Court staff assigned to this case," *id.* ¶ 187. Plaintiffs state that a significant portion of the class members are U.S. citizens – "[t]he best available information indicates that approximately 44% of the par value of AT1 bonds were held by U.S. persons or institutions at 12/31/2022; more than 19% in the New York metro area alone." *Id.* ¶ 186. Plaintiffs claim that Credit Suisse AT1 bondholders, including the proposed Class members, have suffered direct loss or damage due to the Defendants' negligent breach of the statutory duties they owed to Credit Suisse's AT1 bondholders under Swiss law. *Id.* ¶¶ 197, 201.

### b. Defendants

Plaintiffs have named nine Defendants, all of whom are U.S. citizens who held various positions within the worldwide Credit Suisse enterprise: Brady Dougan, Eric Varvel, James Amine, Timothy O'Hara, David Miller, Brian Chin, Robert Shafir, Richard Thornburgh, and Michael Klein. *Id.* ¶¶ 41–49.

Dougan was a member of Credit Suisse's Executive Board and was Credit Suisse's CEO from May 2007 until his resignation in June 2015. *Id.* ¶¶ 41, 176.

Varvel was the head of Credit Suisse's Investment Banking ("IB") Division from September 2009 until October 2014, and Global Head of Asset Management within the Company's Wealth Management division from 2016 to March 2021. *Id.* ¶ 42.

Amine worked at Credit Suisse from 2005 until 2019; he was head or co-head of Investment Banking from October 2014 until November 2019. *Id.* ¶ 43.

O'Hara was co-head of Investment Banking from October 2014 until November 2015, and head of Global Markets until September 2016. *Id.* ¶ 44.

Miller was head of Investment Banking from November 2019 until August 2020, after which he remained at Credit Suisse in senior Investment Banking roles. *Id.* ¶ 45.

Chin was head of Global Markets from September 2016 until August 2020, and head of Investment Banking from August 2020 until he was fired in March 2021. *Id.* ¶ 46.

Shafir became a member of Credit Suisse's Executive Board in 2007, and was the CEO of the Americas region from 2007 to 2010. *Id.* ¶ 47. He served as the CEO of Asset Management from 2008 to 2012, and was the joint head of Private Banking and Wealth Management and the Regional CEO for the Americas from 2012 until he left Credit Suisse in 2015. *Id.*

Thornburgh was a member of Credit Suisse's Board of Directors from 2006 until 2016, Vice Chairman of the Board from 2014 until 2016, a member of the Risk Committee of the Board from 2006 until 2016, and Chair of the Risk Committee from 2009 until 2016. *Id.* ¶ 48.

Finally, Klein joined Credit Suisse's Board of Directors in 2018, and left the Board in October 2022. *Id.* ¶ 49. He served on the Board's Risk Committee from 2018 until 2021. *Id.* In February 2023, the Company announced that Klein would join the Executive Board, had been appointed CEO of Banking and of the Americas, and had been designated CEO of CS First Boston.[2] *Id.*

---

[2]    The Court takes judicial notice of Credit Suisse's press release announcing the appointment of Klein as Chief Executive Officer of Banking and of the Americas as well as CEO designate of CS First Boston. *See* Press Release, Credit Suisse, Credit Suisse Group announces the acquisition of The Klein Group LLC, the appointment of Michael Klein as Chief Executive Officer of Banking and of the Americas as well as CEO designate of CS First Boston (Feb. 9, 2023), https://www.credit-suisse.com/about-us-news/en/articles/media-releases/acquisition-klein-group-llc-appointment-michael-klein-csfb-202302.html [https://perma.cc/YTR5-YT7X]; *see also In re Bank of America AIG Disclosure Securities Litig.*, 980 F.Supp.2d 564, 570 (S.D.N.Y. 2013).

As the reader will readily appreciate, all of the Defendants except Klein were long gone from Credit Suisse – most of them for many years – when the Bank imploded in the spring of 2023.

Plaintiffs assert that the Defendants were collectively responsible for Credit Suisse's financial controls and instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols." *Id.* ¶¶ 176–78. While in office (which is to say, until 2015), Dougan had duties encompassing the entire enterprise and was responsible for managing Credit Suisse as a whole. *Id.* ¶¶ 41, 176. Varvel, Amine, O'Hara, Miller, and Chin were responsible for managing the IB division during their tenures as heads of the IB division (which ended in 2014, 2019, 2015, 2020, and 2021, respectively). *Id.* ¶¶ 42–46, 177. Shafir was responsible for managing the Asset Management Division until 2012, and the Private Banking and Wealth Management Division until 2015. *Id.* ¶¶ 47, 178.

Plaintiffs claim that instead of fulfilling their duties, Dougan, Varvel, Amine, O'Hara, Miller, Chin, and Shafir: "materially contributed to Credit Suisse's toxic culture of excessive risk-taking, prioritizing short-term profits over long-term stability, permitting compensation structures that incentivized imprudent risk-taking, and not requiring diligent compliance and risk management;" and "breached [their] duties by failing repeatedly in each of [those] areas." *Id.* ¶¶ 176–78. According to Plaintiffs, Dougan, Varvel, Amine, O'Hara, Miller, Chin, and Shafir's "acts and omissions in breach of their duties render them responsible – and legally liable – for the misconduct, malfeasance, and managerial negligence described [in the Complaint] and for the loss of trust that brought Credit Suisse down and caused the AT1 bonds to be wiped out." *Id.*

Plaintiffs state that, as members of the Company's Board of Directors and the Board's Risk Committee, Thornburgh (until 2016) and Klein (from 2018 until 2022) had duties encompassing

the entire enterprise during the time each was in office; had responsibility for oversight and supervision of those they appointed to manage Credit Suisse's business, including but not limited to, members of the Executive Board; had responsibility for financial controls; and had responsibility for instilling "a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols." *Id.* ¶¶ 48–49, 179. Plaintiffs assert that Thornburgh and Klein "breached their duties by failing repeatedly in each of [those] areas" and "[t]heir acts and omissions in breach of their duties render them responsible – and legally liable – for the misconduct, malfeasance, and managerial negligence described [in the Complaint] and for the loss of trust that brought Credit Suisse down and caused the AT1 bonds to be wiped out." *Id.*

Plaintiffs describe their claims as "aris[ing] from each Defendant's failures in connection with risk management, and more specifically, the bad risk culture he instilled then failed to fix." *Id.* ¶ 180. Allegedly, "[t]he cumulative weight of these failures resulted in the 'loss of trust that had accumulated over the years' leading to the collapse of Credit Suisse." *Id.* ¶ 181. Plaintiffs assert that, based on the Defendants' roles as "Directors and senior managers" of Credit Suisse, a Swiss stock company that was governed by Swiss statutory law, the Defendants – "[w]herever located" – were bound by and owed Credit Suisse, its shareholders, its creditors, and its bondholders certain statutory duties under Articles 716a, 716b, and 717 of the Swiss Code of Obligations and are liable for their negligent breaches of those duties pursuant to Articles 754 and 759 of the Swiss Code of Obligations. *Id.* ¶¶ 24, 174. Plaintiffs contend that "Defendants' negligent breaches of their statutory duties brought the bank to that cliff's edge from which there was no return." *Id.* ¶ 25.

## II.    Factual Allegations

The facts below are drawn from the allegations in the Amended Complaints (the "Complaints"). The well-pleaded facts are presumed to be true for purposes of the motions to dismiss. The collectively pleaded facts (*i.e.*, the allegations against "Defendants" collectively) cannot necessarily be presumed true, especially when Defendants are alleged to have either done or failed to do things after they were no longer affiliated with Credit Suisse – in other words, those allegations are not, on their face, "well-pleaded."

### a.    Credit Suisse's AT1 Bonds

AT1 bonds are hybrid securities issued by banks – in these cases, by Credit Suisse – that meet the criteria for Tier 1 (or "going concern") regulatory capital. *Id.* ¶ 70. AT1 bonds are "*subordinated* to depositors, general creditors, and subordinated debt of the bank, meaning they are at the bottom of the bank's capital structure, sitting (in general) just above equity." *Id.* (emphasis in original). AT1 bonds "are designed to ensure that bondholders bear losses before equity holders in certain circumstances," *id.* ¶ 71; "in all events, they are subordinated to all creditor claims, meaning in a bankruptcy or resolution scenario, the AT1 bonds are likely to be wiped out entirely (as would have happened in the specific case of Credit Suisse)." *Id.*

AT1 bonds "have a '*principal loss absorption*' feature whereby they are either (depending on the specific terms of issue) (i) converted to common shares at a pre-set trigger point or (ii) written down to allocate losses to the instruments at the pre-set trigger point. The conversion or write-down is triggered when the bank's Common Equity Tier 1 (CET1) ratio drops below a specified point." *Id.* ¶ 70 (emphasis in original). But "the bank's regulator can under certain circumstances trigger a conversion or write-down without regard to whether the pre-set trigger points have been crossed." *Id.*

According to Plaintiff, due to the "peculiar nature and characteristics of the Credit Suisse AT1 bonds," "unless and until the Bank came under financial distress severe enough to threaten its continued independent existence, AT1 holders continued to be paid, and the market valued the bonds at or near par (adjusted for interest rate risk)." *Id.* ¶ 72. Thus, while Credit Suisse faced multiple scandals and endured extensive losses over the years, these adverse events "had little apparent and immediate impact on AT1 bond pricing – or risk to the AT1 bonds, as assessed by the market – even as these scandals and losses caused immediate drops in the stock price." *Id.*

In addition to AT1 bonds, Credit Suisse had another set of securities it initially treated as Tier 1 Bonds for regulatory purposes: Contingent Capital Awards ("CCAs"), or Credit Suisse Employee AT1 bonds. *Id.* ¶ 96. The difference between AT1 Bonds and CCAs is that AT1s are offered to outside creditors, like Plaintiffs here, while CCAs were awarded to Credit Suisse executives and board members as bonuses, deferred compensation, or retentions payments. *Id.* ¶ 167. Plaintiffs estimate that there are $400 million to $700 million in granted or authorized Tier 1 CCA instruments for executives and board members, some of which are owned or intended for the named Defendants in these actions. *Id.*

### b. Credit Suisse's Gradual Decline

Credit Suisse, a 167-year-old international banking and financial services institution, ceased to exist as an independent entity in mid-March 2023. *Id.* ¶ 3. With its collapse came the cancellation of over $17 billion of AT1 bonds issued by the Bank. *Id.*

Plaintiffs place the blame for the destruction of Credit Suisse on its New York IB Division, which allegedly was the "primary source" of the Bank's "most significant publicly reported scandals, and illegal and unethical conduct." *Id.* ¶¶ 4, 74. The IB Division, according to Plaintiffs, had an "appetite for self-dealing and risk-taking," "was the principal source of the toxic culture

that valued short-term gain over long-term trust and led to countless scandals and billions of dollars of U.S. government penalties – and [Plaintiffs] and the other Class members' losses," and "took voracious and ultimately catastrophic risks that culminated in Credit Suisse's collapse – risks that were allowed to build due to the persistent failure of Defendants to rein in their self-interested gambling and properly observe basic risk management and adhere to a modicum of appropriate risk culture." *Id.* ¶¶ 4, 74–75.

Plaintiffs assert that "The 'arsonists' in charge of Credit Suisse's risk culture – New York-based members of the Executive Board, especially those leading (among others) IB and the risk function – caused its ultimate death spiral and collapse." *Id.* ¶ 85. In the Complaints, Plaintiffs craft a historical narrative, beginning with Dougan's promotion to Credit Suisse's CEO in 2007, *id.* ¶ 86, detailing not only the growth of the IB Division's – and "Dougan's disciples" – power and influence, but also the supposed connection between the "toxic New York culture" and the occurrence of "a series of high-profile legal and financial disasters during, or arising from, the Dougan Era." *Id.* ¶¶ 86–132. These "high profile legal and financial disasters," *id.* ¶ 97, include:

- "[T]he stew of greed, dishonesty, and managerial negligence flowing from the Asset-Backed Securities ('ABS') created and sold by the Structured Credit business within IB during 2005-2007," *id.* ¶ 98, and the resulting more than $9 billion in fines and settlements Credit Suisse paid for its role in structuring and selling the securities, *id.* ¶ 100;

- A guilty plea in 2013 by a senior Credit Suisse Managing Director for mismarking ABS securities, *id.* ¶ 101;

- A guilty plea in 2014 by Credit Suisse for criminal conspiracy to aid and assist U.S. taxpayers in filing false returns and a related $2.6 billion fine, *id.* ¶ 103;

- A \$135 million fine from the New York State Department of Financial Services to Credit Suisse for violating New York banking laws between 2008 and 2015 in connection with manipulating and rigging the foreign exchange currency market, *id.* ¶ 105; and

- The Mozambique Tuna Boat Scandal, which consisted of a series of corrupt and illegal transactions by Credit Suisse's New York IB Group between 2012 and 2016 and resulted in Credit Suisse and several of its investment bankers entering guilty pleas in the Eastern District of New York in 2019 and 2021,[3] \$547 million in penalties, and the imposition of a monitorship over the Bank, *id.* ¶ 106.

Plaintiffs allege that these scandals and losses "were emblematic of deeper and broader problems at Credit Suisse – a cascade of individual acts enabled by a toxic culture, created by top leadership and particularly the top IB leadership in New York – that was progressively resulting in loss of trust." *Id.* ¶ 107.

Plaintiffs assert that until the end of their respective tenures at Credit Suisse, Defendants Dougan and Shafir – both of whom left Credit Suisse well prior to the beginning of the Class Period – "continued to foster the toxic risk culture and to enter into problematic transactions," *e.g.*, by doing business with Archegos Capital Management ("Archegos"), "that eventually contributed to the bank's collapse." *Id.* ¶¶ 108, 132. After non-Defendant Tidjane Thiam became CEO of Credit Suisse in July 2015, *id.* ¶ 110, he "was forced during his tenure to deal with a number of what he called "legacy issues," *i.e.*, issues that he had inherited from the Dougan years," *id.* ¶ 115,

---

[3]   The Court takes judicial notice of when the Company and its officials entered guilty pleas in the Eastern District of New York in connection with the Mozambique Tuna Boat Scandal. *See* Press Release, Office of Public Affairs, U.S. Dept. of Justice, Credit Suisse Resolves Fraudulent Mozambique Loan Case in \$547 Million Coordinated Global Resolution (Oct. 19, 2021), https://www.justice.gov/opa/pr/credit-suisse-resolves-fraudulent-mozambique-loan-case-547-million-coordinated-global [https://perma.cc/3T5G-26LD]; *see also In re Bank of America AIG*, 980 F.Supp.2d at 570.

including: a huge number of illiquid positions primarily involving Collateralized Loan Obligations and distressed credit in the Global Markets Division, *id.* ¶ 116; and a $214 million loss when Malachite Capital Management defaulted in March 2020, *id.* ¶ 118. During the tenure of Thiam's successor, non-Defendant Thomas Gottstein, *id.* ¶ 122, the Company endured: the effects of the March 2021 insolvency of Greensill Capital (UK) Ltd. ("Greensill"), a "huge" Credit Suisse IB and Asset Management client, *id.* ¶ 126; and a $5.5 billion loss following the March 2021 "blow-up" of Archegos, *id.* ¶ 132.

Investigative reports over the years – whether commissioned by Credit Suisse, *id.* ¶ 135, or authored by FINMA, *id.* ¶ 138 – discuss cultural, personnel, and business process issues at Credit Suisse, *id.* ¶¶ 136–137; "condemn[] senior management – including members of the Executive Board – for violating their . . . obligations to 'prioritize risk management' and to create and enforce, across the enterprise, 'a [c]ulture of [r]esponsibility, [a]ccountability, and [r]espect for [c]ontrols," *id.* ¶ 137; and conclude that "[t]he repeated scandals and losses severely damaged [Credit Suisse's] reputation and undermined confidence in the bank and its management," *id.* ¶ 141.

Plaintiffs allege that, "By the summer of 2022, fixing the bank's admittedly broken risk culture was front and center for senior management," *id.* ¶ 150, but assert that, "The frequency and severity of the scandals, blow-ups, fines, and even criminal convictions inevitably led progressively and inexorably to the widely accepted view that Credit Suisse's culture, particularly its 'risk culture,' created and propagated by the New York Investment Bank, was rotten and was not getting better. Defendants [only one of whom, Klein, was at that point affiliated with Credit Suisse] continued to elevate their personal paycheck over the interests of depositors, shareholders, and creditors, and they flouted any semblance of proper risk culture and risk mitigation, preferring

to gamble with house money to enrich themselves." *Id.* ¶ 8. Plaintiffs consider the cumulative effect of the individual scandals – and the "overwhelming fear of what lurked beneath" – as what "ultimately led to the fatal loss of trust" in the Bank. *Id.* ¶ 13.

### c.  Credit Suisse's March 2023 Collapse

Credit Suisse met its end in March 2023, after "'loss of trust' manifested in huge and accelerating outflows" from the Bank. *Id.* ¶ 156. During the week of March 13, 2023, the Bank reached its internal liquidity limit at the Swiss National Bank ("SNB"), *id.* ¶¶ 17, 157, after which the Swiss government provided the Bank with $43.5 billion in "extraordinary" liquidity assistance on March 15, 2023, *id.* ¶ 158. By March 16, 2023, a further $15.6 billion was withdrawn from customer accounts; in response, the Swiss government provided an additional $22.3 billion in "extraordinary" liquidity assistance in light of the "foreseeable or continuing outflows." *Id.* ¶ 159.

According to Plaintiffs, by the weekend of March 18–19, 2023, the Swiss government and the Swiss Financial Market Supervisory Authority ("FINMA") determined they had to act, since, according to the Swiss Minister of Finance, "Credit Suisse would not have survived Monday," *i.e.*, the next trading day. *Id.* ¶¶ 14, 162. The Swiss government and FINMA "concluded they had but a few viable options for Credit Suisse: bankruptcy, resolution, nationalization, or a forced sale." *Id.* ¶ 163.

The Swiss government and FINMA proceeded to force a merger of Credit Suisse into one of its competitors, UBS Group AG ("UBS"), another Swiss corporation. *Id.* ¶ 17. To facilitate the merger, on March 19, 2023, FINMA issued a decree (the "FINMA Decree") to Credit Suisse, ordering the write-down of all of Credit Suisse's outstanding AT1 bonds to zero. *Id.* ¶¶ 17, 164. FINMA had concluded that: "Credit Suisse Group [was] experiencing a crisis of confidence, which ha[d] manifested in considerable outflows of client funds;" "it was necessary for the authorities to

take action in order to prevent serious damage to the Swiss and international financial markets;" the Bank had experienced "substantial liquidity outflows since October 2022" and the customer withdrawals accelerated from March 13 and 14, 2023; and as a result of the "major reputational damage," the "deep crisis of confidence," the accelerating customer withdrawals, and the resulting liquidity shortages, Credit Suisse had to zero out the value of all outstanding AT1 bonds to "prevent insolvency" and to "ensure the continued existence of [Credit Suisse]." *Id.* ¶ 164. Plaintiffs claim that though the FINMA Decree was "the immediate instrumentality by which the AT1 bonds were wiped out," it "was not the cause of the wipeout or of the holders' losses" – "Loss of trust was the cause." *Id.* ¶ 166.

Plaintiffs allege that, nearly two months before the FINMA Decree and Credit Suisse's collapse, *id.* ¶¶ 167–68, Credit Suisse executives "were scheming behind the scenes . . . to insulate themselves and former highly-placed executives from losses they anticipated in connection with the Tier 1 capital instruments, *i.e.*, the Credit Suisse Employee Contingent Capital Awards ('CCAs') and AT1 bonds," *id.* ¶ 167. On January 12, 2023, Credit Suisse informed FINMA that it would no longer count CCAs as Regulatory Core Tier 1 capital. *Id.* Plaintiffs view this as support for their belief that, "Credit Suisse executives knew—based on their insider knowledge of the dire situation of the bank, the deepening crisis of confidence, and the scale of customer and client withdrawals—that the value of Tier 1 capital component of their own compensation had evaporated or been dramatically diminished," *id.* ¶ 168, and "took decisive and aggressive action to protect their own Tier 1 exposure over those of Plaintiff[s] and the Class," *id.* ¶ 169.

Following the FINMA Decree, Credit Suisse attempted to save the CCA instruments by asking FINMA to reconsider its decision as applied to CCAs. *Id.* ¶ 172. But, on March 23, 2023, FINMA denied Credit Suisse's request for reconsideration and determined that the CCAs were

covered by the FINMA Decree – and thus were to be written-off and canceled. *Id.* ¶ 173. Plaintiffs assert that FINMA's "decision merely confirmed what the Credit Suisse executives had known months before – that the 'loss of trust that had accumulated over the years;' had already likely damaged, and threatened to destroy, the value of Tier 1 capital instruments like the AT1 bonds and the CCAs as early as January 2023." *Id.*

Again, Plaintiffs allege that "Defendants" did these things without regard to the pleaded fact that most of them had left Credit Suisse by 2020, *id.* ¶¶ 41–49, and all but Klein were out of the Company long before any requests were made to FINMA about the treatment of the CCAs in 2023, *id.* ¶ 49. As a matter of pure logic, the only Individual Defendant who could have been complicit in actions taken in the weeks and months immediately prior to the closure of Credit Suisse was Klein.

### III.    Procedural History

The *Schur* and *Hohimer* Complaints were filed on December 18, 2023 and December 22, 2023, respectively, and were virtually identical to the complaint in *Star Colbert v. Dougan*, 23 Civ. 7297. On January 2, 2024, the Court stayed *Schur* and *Hohimer* while deciding the motion to dismiss that was pending in *Star Colbert*. On March 20, 2024, *Star Colbert* was dismissed on *forum non conveniens* grounds. On March 21, 2024, I instructed the *Schur* and *Hohimer* Plaintiffs to show why *Schur* and *Hohimer* should not be dismissed for substantially the same reasons as *Star Colbert*. Dkt. No. 5.[4] On March 29, 2024, the Plaintiffs asked that the Court lift the stay to allow them to amend their complaints, Dkt. No. 6, and on April 8, 2024, I granted that request, Dkt. No. 8.[5]

---

[4]    All Dkt. references are to the *Schur* Docket, unless stated otherwise.
[5]    *See Hohimer* Docket.

On April 15, 2024, Plaintiffs filed Amended Complaints. The Complaints parrot each other. Each pleading alleges one cause of action arising under Swiss law: the Defendants' alleged negligent breach of statutory duties in violation of Swiss Code of Obligations Articles 716a, 716b, 717, 754, and 759. Dkt. No. 7.

Defendants moved to dismiss both Complaints. Dkt. No. 15.

## DISCUSSION

### I.    Plaintiffs' Claims Are Dismissed On *Forum Non Conveniens* Grounds

Plaintiffs allege that Defendants, in their mismanagement of Credit Suisse, negligently breached the statutory duties they owed to Credit Suisse AT1 bondholders under the Swiss Code of Obligations, which regulates Swiss companies.[6] Compl. ¶ 174. Specifically, Plaintiffs asserts that the Defendants violated Articles 716a, 716b, 717, 754, and 759 of the Swiss Code of Obligations. *Id.* ¶¶ 174–80.

Article 716(a) of the Swiss Code of Obligations lists a Board of Directors' non-transferable and inalienable duties under Swiss Law, which include: the "overall management of the company and the issuing of all necessary directives;" the organization of "the accounting, financial control and financial planning systems as required for management of the company;" the appointment and dismissal of "persons entrusted with managing and representing the company;" and the "overall supervision of the persons entrusted with managing the company, in particular with regard to compliance with the law, articles of association, operational regulations, and directives." Article 716(b), on the "Delegation of Business Management," states that, "Unless the articles of

---

[6]    An English translation of Part Five: The Code of Obligations of the Swiss Civil Code can be found on the Swiss Confederation's online platform for federal law: https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en, *archived at* https://perma.cc/GTM2-W37D.

association provide otherwise, the board of directors may delegate the management of all or part of the company's business in accordance with [organizational] regulations to individual members or third parties (executive board)." If the company's shares are listed on a stock exchange, "the management of the company's business may be delegated to individual members of the board of directors or to other natural persons. The management of the company's assets may be delegated to natural persons or legal entities." Article 717, titled "Duty of Care and Loyalty," provides that: "The members of the board of directors and third parties engaged in managing the company's business must perform their duties with all due diligence and safeguard the interests of the company in good faith." Article 754 states that, "The members of the board of directors and all persons engaged in the business management or liquidation of the company are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties." Article 759 governs joint and several liability.

Plaintiffs claim that, "Wherever located, Credit Suisse's directors and executive board members were bound by duties set out in the Swiss Code of Obligations ('CO'). Those duties were owed not only to Credit Suisse but also, by statute, directly to its shareholders and creditors." Compl. ¶ 24. Plaintiffs assert that "Credit Suisse AT1 bondholders, including Plaintiffs and each of the other Class members, as creditors, have suffered direct loss or damage due to Defendants' negligent breach of their duties. . . ." *Id.* ¶ 201.

In response, the Defendants contend that "The Amended Complaints are the latest attempt to assert Swiss-law claims against former directors and officers of Credit Suisse . . . a Swiss corporation – seeking to recover for losses on AT1 bonds that were issued in Switzerland and which are governed by Swiss law (and which contain a Swiss forum-selection clause), after those bonds were the subject of a mandatory write-down by the Swiss financial regulator, FINMA."

MTD, at 1. Defendants urge this court to dismiss Plaintiffs' Swiss law claims either on the basis of *forum non conveniens* or because Plaintiffs have failed to state a claim for relief under Swiss law.

As was the case in *Star Colbert*, I find that, whatever merit Plaintiffs' claims may have, "This litigation raises another instance of the common cases in which plaintiffs commence lawsuits in United States courts to adjudicate disputes entailing alleged losses suffered from commercial transactions and other events that occur predominantly in a foreign country. . . . Plaintiffs' claims involve not an ordinary commercial dispute between two parties to a transaction, but matters of corporate governance that implicate the legal interests of countless third-party shareholders around the world, not just those litigants now before the Court." *In re Alcon S'holder Litig.*, 719 F.Supp.2d 263, 268 (S.D.N.Y. 2010). Plaintiffs seek to recover for losses on bonds that were the subject of a mandatory write-down by order of the Government of Switzerland. Compl. ¶ 17. They are suing exclusively for violations of Swiss law by the directors and officers of a Swiss corporation. The bonds whose write-down forms the basis for the suit contain a Swiss forum-selection clause.

As Defendants point out in their motion to dismiss, Plaintiffs have made two notable changes from the pleading in *Star Colbert*: "They tactically select only U.S. named Plaintiffs and only U.S. named Defendants." MTD, at 1. But that, it turns out, is not a difference that makes a difference. This dispute should be adjudicated in Switzerland. Defendants' motions are GRANTED.

### a. The *Forum Non Conveniens* Doctrine

The *forum non conveniens* doctrine is a discretionary device that permits a court, in certain instances, to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir.

2000) (citation and internal quotation marks omitted); *Olin Holdings Ltd. v. Libya*, No. 21-cv-4150, 2022 WL 8654507, at *7 (S.D.N.Y. Mar. 23, 2022). "The central purpose of a *forum non conveniens* inquiry is to determine where trial will be most convenient and will serve the ends of justice." *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991).

Courts in this Circuit engage in a three-step process to determine whether *forum non conveniens* dismissal is appropriate. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005). The first step requires the Court to determine the degree of deference to be afforded to the plaintiff's choice of forum. *Id.* at 153–54. Next, the Court examines whether an adequate alternative forum exists. *In re Alcon*, 719 F.Supp.2d at 269 (citations omitted). Finally, the Court must balance the private and public interest factors enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) that are implicated in the choice of forum. *Olin Holdings*, 73 F.4th at 109; *Wiwa*, 226 F.3d at 100; *Norex*, 416 F.3d at 153. The defendant has the burden of establishing that an adequate alternative forum exists, and then showing that the balance of private and public interest factors tilts heavily in favor of the alternative forum. *Olin Holdings*, 73 F.4th at 109; *Wiwa*, 226 F.3d at 100.

Defendants urge this court to dismiss the Complaints on the basis of *forum non conveniens*, arguing, as the defendants did in *Star Colbert*, that (1) Plaintiffs' choice of forum should be given no deference, (2) Switzerland remains an adequate forum to adjudicate claims of corporate mismanagement under Swiss law, and (3) the *Gilbert* private and public interest factors weigh strongly in favor of dismissal. For the most part, I agree with Defendants.

### (1) Deference to Plaintiffs' Choice of Forum

While "generally, there is a strong presumption in favor of the plaintiff's choice of forum," *Do Rosario Veiga v. World Meteorological Org.*, 486 F.Supp.2d 297, 303 (S.D.N.Y.

2007) (citations omitted), "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations," *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001):

> Factors to be considered include: "the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." On the other side of the equation, circumstances "generally indicative of forum shopping," *see Norex*, 416 F.3d at 155, include "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum."

*Maersk, Inc. v. Neewra, Inc.*, 554 F.Supp.2d 424, 451 (S.D.N.Y. 2008) (citing *Iragorri*, 274 F.3d at 72). Significantly, "a district court is not required to consider every single factor specifically in making this determination," *Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG (Erste Bank)*, 535 F.Supp.2d 403, 408 (S.D.N.Y. 2008) (citing *Norex*, 416 F.3d at 155). "[W]here the circumstances indicate that the parties and material events bear no bona fide connection to the United States, or that in relation to the core operative facts in dispute the parties and events at best have only marginal links to the plaintiff's chosen venue, that choice of forum is not entitled to special deference." *Do Rosario Veiga*, 487 F.Supp.2d at 302.

Applying the *Iragorri* sliding scale to the instant actions, Plaintiffs' choice of the Southern District of New York as the forum to litigate their Swiss law claims can be accorded only a minimal level of deference. *See Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F.Supp.3d 274, 297 (S.D.N.Y. 2018). Though the record indicates that genuine convenience may have informed Plaintiffs' choice of a New York forum, *Norex*, 416 F.3d at 155, the core

operative facts in dispute have limited links to the Southern District of New York, *see LaSala v. UBS, AG*, 510 F.Supp.2d 213, 224 (S.D.N.Y. 2007).

First, though there is no "rigid rule of decision protecting U.S. citizen or resident plaintiffs from dismissal for *forum non conveniens*," *Wiwa*, 226 F.3d at 102; *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 n.23 (1981); *Sussman v. Bank of Israel*, 801 F.Supp. 1068, 1073 (S.D.N.Y. 1992), Second Circuit "caselaw and that of the Supreme Court has clearly and unambiguously established that courts should offer greater deference to the selection of a U.S. forum by U.S. resident plaintiffs . . . ." *Wiwa*, 226 F.3d at 102 (citations omitted). Specifically, district courts must consider whether, in view of the plaintiff's U.S. residence, *forum non conveniens* dismissal would cause the plaintiff significant hardship. *Id.* Here, Plaintiffs – U.S. residents – argue that filing in the Southern District of New York was "not an attempt to seek a tactical advantage by filing in a distant forum that would burden defendants with the expense and difficulty of litigating far from home," and assert that litigating their claims in the alternate forum – Switzerland – would cause significant hardship, as it would be difficult, result in extraordinary expenses, and require all parties to travel 4,000 miles to a foreign court, which, in turn, would be oppressive. Opp. Memo, at 3, 6, 13.

Second, all of the Defendants are U.S. citizens, and most of the Defendants can be considered citizens of New York. Compl. ¶¶ 41–49. "Defendants' amenability to suit in this district weighs somewhat in favor of deferring to Plaintiff's choice of forum. However, they are also subject to suit in [Switzerland]," *Lazare Kaplan*, 337 F.Supp.3d at 298; *Schertenleib v. Traum*, 589 F.2d 1156, 1164 (2d Cir. 1978) – according to Plaintiffs' and Defendants' Swiss law experts, Swiss courts have jurisdiction over Credit Suisse's directors and officers. *See* Schnyder/ Hauenstein Decl., 48–51; *Star Colbert* Dkt. No. 34, at 14–16.

But a plaintiff's choice to initiate suit in a defendant's supposed home forum – as opposed to any other forum where the defendant is also amenable to suit – "only merits heightened deference to the extent that the plaintiff and the case possess bona fide connections to, and convenience factors favor, that forum." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 74 (2d Cir. 2003). The record and the parties' submissions temper the level of deference to be accorded to Plaintiffs' choice of forum.

Plaintiffs are suing in a representative capacity. Of course, class action status is merely one consideration in the deference determination, *see Celestin v. Martelly*, No. 18-cv-7340, 2023 WL 6385339, at *5 (E.D.N.Y. Sept. 29, 2023), but Plaintiffs seek to represent, "All holders of a beneficial interest in Credit Suisse U.S. Dollar denominated AT1 notes or Global Certificates between January 12, 2023, and March 19, 2023, inclusive, cleared, settled, recorded or held by or through The Depository Trust Company . . . in New York." Compl. ¶ 184. Despite Plaintiffs' best efforts at centering the proposed Class in the United States – for example, they claim that approximately 44% of the par value of AT1 bonds were held by U.S. persons or institutions as of December 31, 2022, *id.* ¶ 186 – "The proposed class framed in the complaint is a worldwide class," *Gilstrap v. Radianz*, 443 F.Supp.2d 474, 480 (S.D.N.Y. 2006), and by Plaintiffs' own admission, the majority of the bonds were owned by persons or institutions outside of the United States.

Plaintiffs stress the cases' connections to New York and argue that most discovery will focus on the Defendants and other people who worked with or under them in the Investment Bank in New York. They insist that "they do not consider that testimony from former Credit Suisse directors residing in Switzerland or Credit Suisse board minutes will be necessarily required to try the case as pleaded." Opp. Memo, at 12. Plaintiffs further assert that "discovery of

U.S.-resident non-defendants would be far more difficult and expensive" in Switzerland. *Id.* at 11–12. It seems that Plaintiffs are arguing that since "the loss of trust" that allegedly led to Credit Suisse's downfall "traces primarily to continuing risk culture problems in connection with the Investment Bank in New York," *id.* at 12, this limits the need for information from FINMA and the Swiss government. Plaintiffs explain that they "do not intend to contest the actions of FINMA or the Swiss government, or their public explanations as to their actions and the options they were faced with." *Id.* at 12.

Additionally, Plaintiffs' Amended Complaints – presumably in an effort to center their actions in New York – now contain references to the role of the Depository Trust Corporation, or DTC, as the clearing agent for "USD denominated AT1 Notes," Compl. ¶¶ 34–35, 53; Opp. Memo, at 2, and include the claim that "[t]he New York-based Investment bank . . . served as the sole Book-running Manager and acted as the sole representation of the syndicate of managers involved in the issuance of the AT1 bonds," Compl. ¶¶ 33, 38, 52.

But contrary to Plaintiffs' characterization of their cases, the core operative facts underlying their claims "arise mostly out of the operations of [a foreign entity] outside of the United States," *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F.Supp.2d 712, 725 (S.D.N.Y. 2011) (citing *In re Alcon*, 719 F.Supp.2d at 269), and bear little connection to the Southern District of New York, *In re Alcon*, 719 F.Supp.2d at 269. To put it succinctly: (1) Plaintiffs' only allege violations of Swiss law; (2) these cases are about the alleged mismanagement of a Swiss bank; and (3) Plaintiffs' claims arise proximately from the write-down of the AT1 bonds by the Swiss corporation, acting at the direction of the Swiss banking regulator, FINMA. Their claims do not arise from the actions of DTC or any other U.S. entity. Whatever occurred in the years leading up to the action of which Plaintiffs complain – the write-down of the

AT1 bonds – the decision to write down the bonds was made not in New York, but in Switzerland. So as much as Plaintiffs attempt to paint their cases as involving a New York-based investment bank and not Swiss regulators, "[e]very significant aspect of [these] case[s] – which [are] based on board-level and executive level decisions of a Swiss corporation – boils down to Switzerland: . . . the location of the alleged wrongdoing, the applicable law, and the majority of witnesses and documents." *Cattan v. Rohner*, 2023 N.Y. Slip Op. 31213, 2023 WL 2868337, at *8 (N.Y. Sup. Ct. Apr. 10, 2023) (citation omitted).

Defendants correctly describe the Complaints as "hav[ing], essentially, two substantive parts: allegations concerning Defendants' alleged misconduct dating back over a decade, and allegations concerning the events in March 2023 that led to the write-down of the AT1 bonds at issue." MTD, at 8–9. It is the first part, not the second, that provides the alleged link to this district and the United States. But as will be discussed more fulsomely below, the various U.S. based scandals and pleas and fines and reports that, per Plaintiffs, led to the write-down of their bonds Bank's downfall are matters of public record. It will require little or no discovery to prove that those events occurred; they can be proved using records that have long been publicly available. And the Complaint itself reveals that, "the multiple Credit Suisse scandals and losses, even as severe as the Archegos and Greensill scandals, had little apparent and immediate impact on AT1 bond pricing – or risk to the AT1 bonds, as assessed by the market." Compl. ¶ 72. Because of the terms of the bonds, the bondholders continued to receive payments, and the market value of the bonds during these "background years" did not decline. *Id.*

However, as alleged in the second part of the Complaints, the actual proximate cause of the Defendants' loss was the order of a Swiss regulator instructing the Bank to write down the bonds. Plaintiffs insist that it was the Credit Suisse officers and Board's years of negligent

mismanagement that caused the write-down, not the actions of the regulators; but the fact is, Swiss governmental regulators issued the decree instructing Credit Suisse to write all AT1 bonds down to zero, *id.* ¶ 172, so their actions and the reasons for those actions will have to be proved in order to try the asserted claims. This Court is well aware, from the pleadings in other cases before this court (notably, *Diabat v. Credit Suisse Group AG*, No. 23-cv-5874) that the write-down decision was the culmination of six frantic months of internal hemorrhaging as Credit Suisse executives tried to find a way to restructure the Company that would stop what is properly characterized as a "run on the bank" – efforts that, in the end, failed. While the mention of those events is conspicuously absent from the pleadings in the two cases presently before the Court, because the write-down of the bonds, not any of the prior scandals, was the proximate cause of Plaintiffs' economic injury, I fail to see how Plaintiffs can avoid exploring the decisions surrounding the direction to write down the bonds. Those decisions cannot be proved by introducing records of pleas or copies of reports, as can the decade and a half of scandals and losses that are so fulsomely described in the Complaint. Proving them would entail calling current and former employees of Credit Suisse, FINMA, and Credit Suisse's successor, UBS. The majority of those witnesses are located outside the United States; only Defendant Klein, the lone defendant who was affiliated with the Bank in the months leading up to the write-down of the AT1 bonds and who might have some information relevant to that decision, is located in New York. Because the action that proximately caused the Plaintiffs' loss took place in Switzerland, supporting documents will likely be located where Credit Suisse held its Board meetings and where the regulators made their decisions – again, in Switzerland. Because evidence about *disputed facts*, as opposed to long-settled and readily *provable* (quite possibly *stipulatable*) *facts*, is predominantly, if not exclusively, located in Switzerland, it appears that, as was the case in *Star Colbert*, there will be significant

barriers to accessing foreign witnesses and evidence in the Southern District of New York. *See Norex*, 416 F.3d at 156; *Celestin*, 2023 WL 6385339, at *5; *infra* pp. 27–32.

The Second Circuit in *Iragorri* said: "Rather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues" – *i.e.*, the *Gilbert* factors, which are discussed below (*infra* pp. 26–37). 274 F.3d at 74. The actual issues to be tried in these cases – the issues that are likely to raise disputed issues of fact, requiring the testimony of witnesses and documents – are not what happened during the long-ago scandals, or what led to the admissions and guilty pleas, or whether certain investments made a decade ago were or were not ill-advised. The triable issues are not, in short, the issues that are extensively discussed in the Plaintiffs' Complaints. The facts of those matters were long ago settled. The triable issues involve the actions of the Swiss regulators and the reasons why those regulators took those actions. And as will be seen below when the *Gilbert* factors are discussed, the convenience factors overwhelmingly favor litigation of these cases in Switzerland.

Finally, and not of the least importance – per the terms of the bonds, the bondholders agreed that Zurich would be the exclusive location for actions relating to the cancellation of the notes. *See Star Colbert* Dkt. No. 34, Ex. 1, at 88. The parties' experts disagree about the scope of the forum-selection clause and whether it applies to this dispute, *see id.*; Schnyder/Hauenstein Decl., at 46. But the very fact that the Plaintiffs consented to a forum-selection clause that places any and all lawsuits about the bonds' cancellation in Zurich totally undermines their argument that a suit about the value of the bonds should be adjudicated in New York. *See also* Schnyder/Hauenstein Decl.,

at 46; *Star Colbert* Dkt. No. 34, Ex. 1, at 88; *Star Colbert*, 2024 WL 1197863, at *6. To me, this suggests that Plaintiffs' choice of forum should be afforded lesser deference.

Thus, Plaintiffs' choice of forum will not be given the heightened deference for which Plaintiffs hoped. *See Niv v. Hilton Hotels Corp.*, 710 F.Supp.2d 328, 335 (S.D.N.Y. 2008). As in *In re Alcon*, 719 F.Supp.2d at 271 n.6, the Court notes "that the level of deference here is tied primarily to the overwhelmingly Swiss nature of the . . . conduct at issue."

But while "a lesser degree of deference to the plaintiff's choice bolsters the defendant's case," it "does not guarantee dismissal." *Iragorri*, 274 F.3d at 74. And so we turn to the next factor.

### (2) Adequacy of Switzerland as a Forum

I already ruled. in *Star Colbert*, that Switzerland is an adequate forum for adjudication of claims arising under Swiss law involving the directors and officers of the same Swiss corporation. Plaintiffs point to no reason why I should alter that conclusion in this suit. While Plaintiffs' Swiss law experts insist that Switzerland is not the only adequate forum for the Plaintiffs' actions, Schnyder/Hauenstein Decl., at 48–59, Plaintiffs do not assert in their opposition papers that Switzerland is in any way an inadequate forum. Therefore, I find that Switzerland offers an adequate alternative forum for the instant actions. *Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, 607 F.Supp.3d 421, 437 (S.D.N.Y. 2022).

### (3) The *Gilbert* Factors

The final step of the *forum non conveniens* analysis is to weigh two sets of factors – the private interest factors and the public interest factors – to determine whether adjudication is more appropriate in the present forum or in an alternative forum. *Gilbert*, 330 U.S. at 508–09; *Online*

*Payment Sols. Inc. v. Svenska Handelsbanken AB*, 638 F.Supp.2d 375, 386 (S.D.N.Y. 2009). "Because much of the [*forum non conveniens*] doctrine's strength derives from its flexibility and each case turns on its own facts, a single factor is rarely dispositive." *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29 (2d Cir. 2002). "*Gilbert* instructs reviewing courts to disturb a plaintiff's choice of forum only where the balance of private and public interest considerations 'strongly favors' the moving defendant." *In re Alcon*, 719 F.Supp.2d at 275.

In these cases, it does.

### 1. Private Interests

The private interests enumerated in *Gilbert*, 330 U.S. at 508–09, embrace: the ease of access to evidence; the cost for witnesses to attend trial; the availability of compulsory process; and all other factors that make trial of a case easy, expeditious, and inexpensive. *Gilbert*, 330 U.S. at 508; *Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998) (citing *Piper*, 454 U.S. at 241; *Gilbert*, 330 U.S. at 508).

"Each of the first three of these factors depends on the location of evidence necessary to a trial in this case and the difficulties associated with seeking to produce that evidence before a court in the Southern District of New York." *Glob. Art*, 607 F.Supp.3d at 438. However, "in light of technological advances in transportation and communication, . . . the location of documents is a factor which is to be given less weight now," *Shtofmakher v. David*, No. 14 Civ. 6934, 2015 WL 5148832, at *3 (S.D.N.Y. Aug. 17, 2015), and "[t]he cost of obtaining testimony from willing witnesses is . . . a fairly minor factor," *Glob. Art*, 607 F.Supp.3d at 439. Certain "inevitable costs" "can be alleviated under U.S. law by the submission of letters rogatory and the availability of videotaped depositions," *Maersk*, 554 F.Supp.2d at 454, but, "there is, of course, a preference for live testimony." *Gilstrap*, 443 F.Supp.2d at 488 (citing *DiRienzo*, 294 F.3d at 30).

Plaintiffs assert that most of the witnesses and evidence needed to prove their claims is in New York or elsewhere in the United States, and little is in Switzerland. Opp. Memo, at 16. They claim that they do not necessarily need: the testimony of foreign members of the Board of Directors; Board minutes; nor testimony/additional documentary evidence from FINMA or the Swiss government that has not already been released to the public in official government reports that can likely be judicially noticed. *Id.* They further assert that testimony from former Credit Suisse employees who worked in New York will be needed to prove the risk culture allegations, and that those individuals would not necessarily agree to testify voluntarily in Switzerland. *Id.* Plaintiffs also claim that other "practical problems that make trial of a case easy, expeditious and inexpensive" – travel costs, language barriers at trial (all parties being native English-speakers), and the like – also weigh in favor of litigation in the U.S. rather than Switzerland. *Id.* at 17.

But Plaintiffs are wrong. Their assertion about how these cases will have to be tried is, as discussed above, *supra* pp. 21–25, demonstrably false. The essence of their claims is that the Swiss regulators demanded that the bonds be written down because of the years of mismanagement. Documents relating to why the Swiss regulators took the action they did will likely be found, as I concluded in *Star Colbert*, in Switzerland; specifically, evidence related to the FINMA Decree and the subsequent write-down of the bonds is likely based in Switzerland. And because Credit Suisse has been subsumed by UBS – which is not a party to these cases – UBS, a Swiss corporation, undoubtedly has custody of many of the corporate documents that would be needed to litigate Plaintiffs' claims. Were the cases to remain in this court, the parties could only access documentary evidence in Switzerland (or in any other countries where they might be) in a manner that is compliant with the country's legal restrictions. Plaintiffs point to

nothing tending to show that UBS has caused any of the evidence Plaintiffs might like to examine to remain in the United States.

It is also probable that some of the relevant documentary evidence – especially the evidence relating to the Employee CCAs and communications between FINMA and Bank representatives about the treatment of those bonds – is in French, Italian, or German, which would require translation, thus increasing litigation costs. *See Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 511 (S.D.N.Y. 1982). Significantly, there is not a single allegation that any of the U.S.-based Defendants was involved in any decisions about how to treat the CCAs for regulatory purposes or in any discussions with Swiss regulators about the CCAs.

Both sides will likely have to call multiple Swiss government officials as non-party witnesses, as those officials are likely to have considerably more relevant knowledge about the actual events and communications leading up to the write-down than the named Defendants (most of whom left Credit Suisse years before the write-down). Examples of potential witnesses include current and former employees of Credit Suisse, UBS, FINMA, and the Swiss government or Swiss agencies (*e.g.*, the Swiss Ministry of Finance, Swiss National Bank). Not only would it be costly for all of these Europeans (most of them Swiss) to travel to the United States, but also there are difficulties related to effecting compulsory process on non-party witnesses residing in Switzerland.

And Plaintiffs do not even acknowledge the fact that a U.S. court might well be imposing costs on a foreign government, which has foreign policy implications that can easily be avoided by requiring the Defendants to fly to Europe – something they undoubtedly did during their employment at Credit Suisse – to have their testimony taken, should their testimony prove necessary.

Plaintiffs' assertion that Swiss regulators and employees of Credit Suisse who dealt with them would not have to be called as witnesses is, frankly, disingenuous. Although the Complaint lists a litany of scandals and adverse events at Credit Suisse going back over a decade prior to the Bank's collapse, I state, again, that Plaintiffs' claims arise out of the cancellation of the bonds. The Plaintiffs must establish why the Swiss regulatory authority instructed Credit Suisse to write down the bonds in the spring of 2023 – specifically, whether FINMA did so because of the Archegos and Greensill losses in 2021, Compl. ¶ 72, 127, 129, 131–32, 147, or the Mozambique Tuna Boat Scandal that occurred between 2012 and 2016, *id.* ¶ 106, or violations of New York banking law between 2008 and 2015 in connection with manipulating and rigging the foreign exchange currency market, *id.* ¶ 105, or the Company's 2014 guilty plea for engaging in a criminal conspiracy to aid and assist U.S. taxpayers in filing false returns, *id.* ¶ 103, or all of the above – or whether it was because of the Bank's loss of customers and assets in the months immediately prior to its seizure and takeover. There will be little dispute about the awful things that happened at Credit Suisse over the past decade and a half. No one is going to have to prove that the Archegos investment happened, or that the Tuna Boat Scandal led to guilty pleas in a United States court, or that the Company admitted to violations of New York banking law, or that Credit Suisse pled guilty ten years ago to assisting U.S. taxpayers in committing tax fraud. As I have already mentioned, the guilty pleas and the fines and the losses and the reports are all matters of public record, and can be established with publicly-filed documents. The testimony of witnesses will not be required to prove that these things happened. Indeed, were these cases to be litigated in this court, the requirement that the cases be litigated as speedily and inexpensively as possible (*see* Fed. R. Civ. P. 1) would obviate the need for many, if not all, of the Defendants to have their depositions taken about these long-ago matters.

Were these cases to remain in the Southern District of New York, obtaining evidence and testimony from the Swiss witnesses who would have to be called would likely implicate the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. *In re Alcon*, 719 F.Supp.2d at 276. "Courts in the Second Circuit have widely recognized that obtaining evidence through the Hague Convention and letters rogatory are [sic] cumbersome and inefficient, and hardly make litigation in the United States convenient." *Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*, No. 11-cv-05801, 2012 WL 3746220, at *7 (E.D.N.Y. Aug. 27, 2012) (citations omitted); *In re Alcon*, 719 F.Supp.2d at 276. "In all probability, these circumstances would cause not only greater financial hardships, but additional litigation and attendant significant delays in preparing the case for trial before this Court, and ultimately in resolving the merits of the dispute." *In re Alcon*, 719 F.Supp.2d at 276. Overall, "[t]his massive inefficiency and inconvenience that [using the Hague Evidence Convention] would create for defendants and plaintiffs is all the more striking given the existence of an alternative forum" – in these cases, Switzerland – "where many of these problems would not arise." *Rabbi Jacob Joseph Sch.*, 2012 WL 3746220, at *7 (citing *Reers v. Deutsche Bahn AG*, 320 F.Supp.2d 140, 162 (S.D.N.Y. 2004)) (internal quotation marks omitted)). And "[t]o the extent plaintiffs are concerned that, should this action be dismissed in favor of an [Swiss] forum, they would be unable to obtain pretrial discovery of persons and documents located within the United States, they may, of course, request that this Court—and any other district court with jurisdiction over individuals they believe to have relevant testimony and/or documents—order such persons to provide such discovery in aid of a foreign proceeding." *Gilstrap*, 443 F.Supp.29 at 489 (citing 28 U.S.C. § 1782).

There will be witnesses who are not parties who live elsewhere, and taking their testimony will be cumbersome and subject to local restrictions. To the extent that travel is involved, the cost will "be borne by the parties regardless of where the litigation takes place." *Celestin*, 2023 WL 6385339, at *8. And while ordinarily, those facts would render this factor neutral, the involvement of the Swiss government in these cases pushes this factor in favor of Switzerland. Rather than navigate the process of attempting to compel those officials to travel to the Southern District, it is far more convenient for the cases to instead proceed within the Swiss court system.

Plaintiffs also argue that forcing them to litigate in Switzerland would likely end these cases, given the requirement to retain Swiss counsel on an hourly fee basis, the need to post a court costs bond in advance, the likely need for so-called After the Event insurance to cover cost-shifting or so-called "loser pays" liability in the event any Swiss litigation is not successful, and other costs that make large-scale individual claimant litigation in Switzerland prohibitively expensive. Opp. Memo, at 16. However, for the reasons discussed in *Star Colbert*, it seems as if Plaintiffs are overstating the financial burden of bringing this lawsuit in light of certain Swiss law principles, *i.e.*, the cost recovery principle that puts an upper limit on payments for costs, and a principle of proportionality, which means that a fee is not to be manifestly disproportionate and is to remain within reasonable limits. 2024 WL 1197863, at *20.

Finally, though the Second Circuit has stated repeatedly that the existence of related proceedings is not even mentioned in *Gilbert*, and therefore should not be given much consideration," *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F.Supp.2d 376, 391 (S.D.N.Y. 2002) (citations omitted); *see DiRienzo*, 294 F.3d at 31, it is not totally irrelevant that there is *already* litigation in Switzerland concerning the AT1 bonds brought by putative

members of (and so by probable opt outs from) the proposed Class.[7] Plaintiffs argue that, "The mere possibility that the outcome of the administrative cases against FINMA might affect damages or causation in this case does not point to either Switzerland or New York; any effects on this case would be the same without regard to forum." Opp. Memo, at 17. This may be true – but since the existence of related proceedings "should not be given much consideration," *In re Ski Train Fire*, 230 F.Supp.2d at 391, Plaintiffs' argument does little to alter the *forum non conveniens* analysis. However, to the extent that the existence of related proceedings carries any weight, it weighs in favor of moving these cases to Switzerland.

### 2. Public Interests

The public interest factors enumerated in *Gilbert*, 330 U.S. at 508–09, include: the administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the local interest in having localized controversies decided at home; and the avoidance of difficult problems in conflict of laws and the application of foreign law. *Murray v. British Broad. Corp.*, 81 F.3d 287, 293 (2d Cir. 1996); *DiRienzo*, 294 F.3d at 31. These considerations also weigh heavily in favor of dismissal of these actions. *Do Rosario Veiga*, 486 F.Supp.2d at 307.

First, the administrative difficulties flowing from court congestion is neutral. *See Giro, Inc. v. Malaysian Airline Sys. Berhad*, No. 10 Civ. 5550, 2011 WL 2183171, at *9 (S.D.N.Y. June 3, 2011); *Glob. Art*, 607 F.Supp.3d at 440. While "The Southern District of New York may have one of the nation's busiest dockets . . . its administration is very efficient." *Glob. Art*, 607 F.Supp.3d at 440.

---

[7]    I cannot help but note that this fact bolsters the conclusion that Switzerland affords the Plaintiffs a perfectly adequate forum to recover their losses.

Next, Plaintiffs assert that, "The jury duty question is different than in *Star Colbert*," as the "central allegations concern local conduct by local New York people, which had tremendous impacts locally (almost 20% of the AT-1 bonds were held by New Yorkers) and beyond. That conduct in New York had impacts both in New York and in other places doesn't make New York jury duty unfair." Opp. Memo, at 17–18.

However, as discussed above, *supra* pp. 21–25, the Court disagrees with Plaintiffs' characterization of their central allegations. The facts surrounding the decision to cancel the bonds are far from local to New York or the United States. Accordingly, it would be unfair to impose jury duty on individuals in the Southern District of New York, a community with, at best, limited relations to the real issue (as opposed to the artfully pleaded issues) in this litigation. The dominant Swiss contacts diminish any purported connection to the New York jury pool. *Palacios v. The Coca-Cola Co.*, 757 F.Supp.2d 347, 362 (S.D.N.Y. 2010). "As a result, '[t]he interest in protecting jurors from sitting on cases with no relevance to their own community weighs heavily' in favor of dismissal." *Id.* at 362–63 (quoting *Alfadda v. Fenn*, 159 F.3d 41, 46 (2d Cir. 1998)).

Third, "There is a significant interest in having localized matters decided in the local forum in accordance with domestic law governing the case." *Do Rosario Veiga*, 486 F.Supp.2d at 307 (citing *Gilbert*, 330 U.S. at 509; *In re Arb. between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 500–01 (2d Cir. 2002) ("*Monegasque*")). "[T]he public interest in having localized controversies decided at home" "requires an evaluation of which forum possesses a stronger local interest in the controversy" – the United States or Switzerland. *LaSala v. TSB Bank PLC*, 514 F.Supp.2d 447, 461 (S.D.N.Y. 2007). That the answer is Switzerland is clear.

Plaintiffs argue that "Credit Suisse's collapse, and the loss of value to AT-1 bondholders, is anything but a localized controversy," and "the cause was more localized in New York than in Switzerland or elsewhere, and effects have been felt here and around the world." Opp. Memo, at 18. They assert that, "Saying that plaintiffs suffered losses 'because' of the FINMA decree is like saying someone is in prison 'because' the warden put him in a cell and slammed the door." *Id.* at 1.

While it is undoubtably true that Credit Suisse's collapse had a global impact, "Whatever interest the United States has, it pales in comparison with that of Switzerland. Switzerland possesses a strong interest in regulating the conduct of banks within its borders," *UBS*, 510 F.Supp.2d at 229 (citation omitted). The FINMA-ordered write-down of Credit Suisse's AT1 bonds is at the heart of these cases – even Plaintiffs acknowledge that the FINMA Decree was "the immediate instrumentality by which the AT1 bonds were wiped out. . . . " Compl. ¶ 166. The uncontested role of the Swiss regulator in instructing Credit Suisse to write-down all of its AT1 bonds "necessarily lessens the United States' interest in the litigation while further increasing that of" Switzerland. *Aguinda v. Texaco, Inc.*, 142 F.Supp.2d 534, 551 (S.D.N.Y. 2001).

Some of the conduct that is alleged to have brought about the collapse of the Bank occurred in New York. But "[b]ecause the core events, operative facts, and associated private and institutional interests at issue are local to Switzerland, the dispute should be resolved in that country." *Do Rosario Veiga*, 486 F.Supp.2d at 307 (citing *Gilbert*, 330 U.S. at 509; *Monegasque*, 311 F.3d at 500–01).

Finally, "United States courts have 'virtually no interest in resolving' disputes governed *exclusively* by foreign law." *Holzman v. Guoqiang Xin*, No. 12-cv-8405, 2015 WL 5544357, at

*10 (S.D.N.Y. Sept. 18, 2015) (quoting *Murray*, 81 F.3d at 293 (emphasis in original)). As Plaintiffs point out in their Opposition Memo, "all agree that Swiss substantive law applies." Opp. Memo, at 18. They concede that this "might slightly support Switzerland," but assert that this court is "well able to sort through Swiss law issues on negligence or breach of duty," and state that the Second Circuit has cautioned against an excessive reluctance to undertake the task of deciding foreign law. *Id.* (citing *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 68 (2d Cir. 1981); *accord Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 492 (2d Cir. 1998)).

And Plaintiffs are correct: though "[d]etermining the content of Swiss law is obviously easier at trial in Geneva," *Schertenleib*, 589 F.2d at 1165, U.S. "[t]rial courts may find and apply foreign law" and "may even use experts on foreign law to assist them." *In re Ski Train Fire*, 230 F.Supp.2d at 391. But this "necessitates the introduction of inevitably conflicting expert evidence on numerous questions of Swiss law, and it creates the uncertain and time-consuming task of resolving such questions by an American judge unversed in civil law tradition." *Schertenleib*, 589 F.2d at 1165. As discussed in *Star Colbert*, 2024 WL 1197863, at *24, parsing through the foreign law issues in these actions will likely require "the interpretation and translation of foreign legal statutes, texts, and treatises," *Cattan*, 2023 WL 2868337, at *6, and while the task of applying foreign law when necessary is "far from impossible," *Ramirez de Arellano v. Starwood Hotels & Resorts Worldwide*, 448 F.Supp.2d 520, 531 (S.D.N.Y. 2006), there are many reasons not to do so in the instant actions. "Switzerland is the forum with the most significant legal contacts with and the greatest jurisdictional interest in the adjudication of the controversy before the Court. Also for these reasons, an action should be tried in a forum familiar with the law governing the case. By contrast, the Court finds no compelling reason why the law and judicial resources of this forum

should be applied to resolve this dispute, nor any overriding American policy interest that would be promoted or enforced by doing so." *Do Rosario Veiga*, 486 F.Supp.2d at 307–08.

### b. After Balancing the Relevant Factors, I Conclude that the Cases Should Be Dismissed

After balancing all of the relevant factors, the Court finds that dismissal on *forum non conveniens* grounds is appropriate. "The dispute[s] at issue [are] decidedly Swiss, and the Court is persuaded that Plaintiffs, if they so choose, would be able to adequately and more appropriately litigate this dispute in Switzerland." *In re Alcon*, 719 F.Supp.2d at 279. "Retaining jurisdiction in this district would not be convenient for the parties or the witnesses and would not promote principles of efficient and economically prudent litigation." *Tel. Sys. Intern., Inc. v. Network Telecom PLC*, 303 F.Supp.2d 377, 385 (S.D.N.Y. 2003). Proceeding in Switzerland would be far more convenient than litigating in the Southern District of New York – "Whatever witnesses, events, and documents associated with relevant conduct may be found outside of Switzerland, the point is that the connection of this action with the United States is marginal at best in comparison to the magnitude of the factual and legal links of all material aspects of the dispute to Switzerland." *Do Rosario Veiga*, 486 F.Supp.2d at 307.

Although I believe that the Defendants are amenable to suit in Zurich, in an excess of caution, I will condition the dismissal of these actions on the Defendants' filing with the Court a consent to jurisdiction in Zurich.[8] They have fourteen days to file written consents with the Court. Counsel may file representations on behalf of their clients.

---

[8]   All Defendants named in this lawsuit have already filed limited consents to jurisdiction in Zurich with respect to the Swiss law claim raised in *Star Colbert*. *See Star Colbert* Dkt. No. 71.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaints are GRANTED.

The Clerk of Court is not to close the files in these actions until further order of the Court.

However, the motions at Dkt. No. 17 in *Hohimer* and Dkt. No. 15 in *Schur* should be removed

from the Court's list of open motions.

This constitutes the decision and order of the Court. It is a written opinion.


Dated: September 19, 2024

_____
U.S.D.J.

BY ECF TO ALL COUNSEL